## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

Christina M. Borgese, Marc Privitera, and North American Lithium, Inc.,

      Plaintiffs,

v.

John Burba and International Battery Metals, Ltd.,

      Defendants.

---

## COMPLAINT

---

Plaintiffs Christina M. Borgese, Marc Privitera, and North American Lithium, Inc., by and through their attorneys, Kim L. Ritter of Minor & Brown, P.C., respectfully file the Complaint as follows:

### JURISDICTION & VENUE

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as this action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2.    This Court has supplemental jurisdiction over Plaintiffs' state law claims by authority of 28 U.S.C. §1367.

3.    Venue is proper pursuant 28 USCS § 1391(2) and 28 U.S.C. § 85 as the contracts which are the subject of this action were entered into and partially performed in Colorado.

{M0390401-1}

## GENERAL ALLEGATIONS

4.      Plaintiff Christina M. Borgese ("Borgese") is an individual residing at 6190 Yardley Lane, San Ramon, CA 94582.

5.      Plaintiff Marc Privitera ("Privitera") is an individual residing at 214 Los Banos Avenue, Walnut Creek, CA 94598.

6.      Plaintiff North American Lithium, Inc. ("NAL") is a California corporation registered to do business in Colorado and has a business location at 6190 Yardley Lane, San Ramon, CA 94582.

7.      International Battery Metals, Ltd. ("IBAT") is a British Columbia business having its principal place of business at 1140-625 Howe Street, Vancouver, BC Canada V6C 2T6 and on July 2, 2018 represented its Colorado place of business at 11479 South Pine Dr., Parker, CO 80134.

8.      John Burba is a Colorado resident and Chief Executive Officer of IBAT residing at 9359 Hidden Pines Court, Parker, CO 80134.

## FACTS

9.      IBAT is a company that is publicly traded on the Canadian Securities Exchange.

10.    IBAT was formerly called Rheingold ("RGE") but will be referred to as IBAT throughout for simplicity.

11.    NAL is a company equally owned by Borgese, Privitera and Burba and is focused on lithium extraction.

12.    NAL was filed as a California corporation on August 22, 2016 and NAL was filed as a foreign corporation in the State of Colorado on December 13, 2017.

13. Selective Adsorption Lithium, Inc. ("SAL") was equally owned by Borgese, Privitera, and Burba and was a technology company.

14. SAL was filed as a Delaware corporation on February 2, 2018 and SAL was filed as a foreign corporation in the state of California on March 6, 2018.

15. IBAT, NAL, and SAL entered into a Share Exchange Agreement ("SEA") on March 4, 2018 to establish the terms of the agreement between the parties including but not limited to an exchange of shares of IBAT for 100% of the shares of SAL including certain intellectual property to be held by SAL, royalty payments from IBAT to NAL, cash payments from IBAT to NAL, and shares of stock and stock options from IBAT to Borgese, Privitera, and Burba, Exhibit 1.

16. Under the terms of the SEA, on April 12, 2018 SAL became wholly owned by IBAT and Borgese, Privitera, and Burba are referred to in perpetuity as the holders of shares issued by SA Lithium in the SEA ("SAL Shareholders").

17. Following the execution of the SEA, IBAT hired Borgese and Privitera, and Burba as employees under the terms of their individual Executive Employment Agreements ("EEA"), Exhibit 2-4.

18. Both the SEA and the individual EEAs are subject to the laws of the State of Colorado.

19. The EEA's contain clauses including terms governing removal for cause, outside work, executive's intellectual property, competitive conduct and exceptions, severance, and change in control.

20. June 29, 2018 IBAT terminated Borgese and Privitera without just cause in breach of EEA Sections 2, 3, 5, 7, Exhibit A and Exhibit B.

21.   IBAT's breach of the EEA caused damages to Borgese and Privitera.

22.   IBAT terminated Borgese and Privitera's employment under the EEAs within a 24 month period following a Change of Control as defined in EEA Exhibit A.

23.   Burba is the CEO, President, and Chairman of the Board of IBAT.

24.   John Ashburn ("Ashburn") was the Chief Legal Officer ("CLO") of IBAT. While at IBAT Ashburn concurrently served as Vice President and General Counsel of Niocorp Developments Ltd.

25.   Logan Anderson ("Anderson") is the CFO and a Director of the Board and past CEO of IBAT.  Anderson concurrently controls Amteck Consulting which receives fees and common shares from IBAT including finder's fees in relation to the closing of the SAL transaction.

26.   Jeremy Ross ("Ross") was a Director of the Board of IBAT. Ross was concurrently affiliated with a different junior mining company.

27.   David Scott ("Scott") worked as IBAT Marketing and was a Director of the Board of IBAT.

28.   In 2010, Borgese and Privitera founded a company, PreProcess, Inc. ("Borgese and Privitera's company").  It is wholly owned by Borgese and Privitera and is a technology and consulting company with expertise including but not limited to project leadership and execution and intellectual property development of lithium extraction.

29.   Borgese and Privitera's company was not a party to any agreement with IBAT or NAL.  It is mentioned in Borgese and Privitera's individual EEAs as not being considered competitive conduct with respect to their employment at IBAT.

30.     Anthony Orler ("Orler") was the legal counsel for Borgese and Privitera's company and NAL and employed at Buchalter, a law firm, as of April 2017. Prior to April 2017 Orler represented both companies while working at a different law firm.

31.     Buchalter is a law firm with an office at 1000 Wilshire Boulevard, Los Angeles, CA 90017-1730.

32.     In 2010, Borgese and Privitera won a World Economic Forum award for Technology Pioneering. In fourteen months, they built and commercialized a mobile and modular system equipped with supercritical technology that could be sent to locations to convert certain waste into fuel grade biodiesel.

33.     From that point forward, Borgese and Privitera discussed the benefits of mobile and/or modular built systems as they consider the impact of mobile and/or modular system deployment on different industries including mining and lithium extraction.

34.     Beginning in 2015, Borgese and Privitera develop intellectual property for lithium extraction on numerous fronts. This included, but was not limited to, combining their knowledge of the methods and benefits of mobile and modular systems and lithium extraction to develop a series of novel ideas including mobile and modular lithium extraction.

35.     Borgese and Privitera had plans to form a separate company, NAL, as an organization to market these technologies.

36.     Privitera is a licensed chemical engineer and licensed controls systems engineer. He developed intellectual property regarding control systems that has many

uses including but not limited to controlling flow in direct lithium extraction.  Borgese and Privitera further developed this intellectual property.

37.     October 28, 2015, Privitera emailed Burba laying out proposed details of the NAL opportunity and asked Burba if he would be interested in becoming a part of NAL.

38.     During the period of January 2016 – March 2016, Borgese and Privitera began to market NAL to a variety of parties.  They had calls and sent out items including but not limited to PowerPoint pitch decks, high level references to the intellectual property Borgese and Privitera developed, and financial spreadsheets with cost estimates.

39.      On February 9, 2016, Borgese and Privitera purchased nalithium.com domain and on February 10, 2016 purchased northamericanlithium.com domain.

40.     On March 9, 2016, Privitera emailed Burba NAL, a teaser pitch deck which referenced intellectual property being developed.

41.     On July 10, 2016, Borgese and Privitera's company received a contact from Paul Austin regarding incorporation of his junior mining company to extract lithium.

42.     On June 11, 2016, Privitera emailed Burba regarding the intellectual property Borgese and Privitera had developed and offered him the opportunity for Burba to be involved.

43.     On August 5, 2016, Borgese, Privitera, and Burba met in Parker, Colorado to discuss the opportunity to be involved as an equal partner in NAL.

44.     Burba accepted the offer and became involved in NAL.

45.     NAL held its first official board meeting with Burba involved.  Privitera and Borgese share the intellectual property they have developed including the mobile and modular systems of an equipment array, extraction column, and membrane concentration with Burba and describe its potential in oilfield and other projects.

46.     On August 7, 2016, Borgese emailed Burba the Salton Sea Lithium Extraction PowerPoint presentation Borgese and Privitera created, which highlights novel methods which include Borgese and Privitera's intellectual property.

47.     On August 13, 2016, Privitera sent Provisional Patent Application "Mobile Extraction Array with Brine Constituent Separation, Purification and Concentration" to Borgese, Burba, and Orler. Burba's name is included on the patent application filing because it is anticipated that Burba will add to the invention claims over time.

48.     On August 19, 2016 Salton Sea Industries, Inc. ("SSI") presents a contract to NAL.  NAL has their attorney Orler edit and review contract.

49.     SSI is a company interested in lithium extraction from geothermal brines in the Imperial Valley of California.

50.     The SSI team members discussed include Patrick Meehan ("Meehan") principal of SSI, Anthony Williams ("Williams") CEO of SSI, and Jerry Rubenstein ("Rubenstein") affiliated with SSI.

51.     On August 22, 2016, Privitera emails Borgese "North American Lithium – Mole System Brine Development Pitch – Rev A – August 2016 which contains intellectual property developed by Borgese and Privitera and sets the strategy for NAL approach to lithium extraction in the Salton Sea as well as Mobile Oilfield Equipment

arrays for oilfield lithium extraction elsewhere.  Privitera emails same pitch and strategy to Burba later the same day.

52.     On August 22, 2016, Borgese files Articles of Incorporation paperwork for NAL with California Secretary of State.

53.     On August 25, 2016, Burba presented NAL an edited contract with SSI which he had altered to be between Burba/SSI Contract. Burba emailed stating that he was entering the SSI contract on his own rather than through NAL "and I decided that it would be simplest to leave the agreement between SSI and me."

54.     On March 23, 2017, NAL and BeiSur OstBarat Agency Ltd. ("BeiSur") enter into a Master Services Agreement ("MSA").

55.     On August 2017, IBAT and NAL negotiate terms regarding Letter of Intent between NAL and IBAT, the points are an entity would be vended into IBAT and receive 49% of IBAT's outstanding common stock, three of five board seats and control of the board if the number of seats were increased, as well as operating control of IBAT for lithium projects.

56.     On September 7, 2017, Borgese and Privitera enter into SSI contract.

57.     IBAT's negotiations with NAL specifically pertained to lithium extraction from oil field brines for the SEA.  Oil field brines are a different resource from other lithium containing resources.

58.     IBAT's acquisition of the intellectual property is expressly limited "in only such manner as such application is used in oil field applications."

59.     On November 6, 2017, SSI executed an amendment to consulting services agreement.

60.     On February 2, 2018, SAL was incorporated pursuant to NALSub provision of the LOI.

61.     On February 26, 2018, Privitera files provisional patent application "System Built of Configurable Units for the Extraction of Constituents from Brine" with the USPTO with Borgese and Privitera as inventors.

62.     On March 3, 2018, Borgese, Privitera, and Burba assigned their rights to SAL relating to oil field applications of patent application 62/577,554 filed October 26, 2017.

63.     On March 4, 2018, IBAT, NAL, and SAL sign the SEA.

64.     On April 9, 2018, Burba emails Borgese, Privitera, and Orler with the EEA Ashburn prepared and writes "There are a number of provisions that should probably be changed.  It does not have any provisions for "Carve Outs" such as the Imperial Valley, etc. We will clearly make provisions for Marc and Christina with respect of some of their noncompeting outside interests.  Please review this and make the appropriate changes."

65.     On April 12, 2018, Closing of SEA and signing of documents by IBAT, NAL, SAL, and Shareholders of SAL.

66.     On April 12, 2018, SAL was delivered to IBAT as required in SEA upon closing.

67.     On April 13, 2018, IBAT Board voted unanimously to accept the individual EEAs entered into between IBAT and Borgese, Privitera, and Burba on April 12, 2018.

68.     On April 13, 2018 IBAT voted unanimously to appoint Borgese and Burba to IBAT Board in accordance with the terms of the SEA with knowledge that Privitera will be nominated to the board in 90 days according to SEA.

69.     On April 13, 2018, Change in IBAT CEO.  Logan Anderson ceases being CEO and Burba becomes President, CEO, and Chairman of the Board of directors of IBAT.

70.     On April 16, 2018, Borgese sent updated action plan summary to Salton Sea Industries, ("SSI") upon SSI's request.

71.     On April 18, 2018 Privitera sent utility information to SSI upon SSI's request.

72.     On April 24, 2018, Burba and Ashburn have conference call with Borgese and Privitera and tell them that they need to abandon their Executive Employment Agreement.

73.     Ashburn stated that IBAT's outside counsel had not reviewed the Executive Employment Agreement.  Borgese answered that they did review and had made hand markups of the items they wanted changed, and those changes were incorporated in the signed document.

74.     Ashburn asked where the hand markups were located and Borgese responded that she was looking at the markups as they spoke.

75.     Borgese and Privitera inform Burba and Ashburn on the conference call that they would like to take things one step at a time and would consider making changes to their Executive Employment Agreements once some of outstanding SEA terms are completed.

76.     No new EEA is sent to Borgese or Privitera for their review.  Burba is provided a new EEA he and Ashburn sign it on June 26, 2018.

77.     On April 25, 2018, as a result of the April 24 Burba/Ashburn call Borgese calls SSI to inform them that they need to have a discussion.

78.     On April 26, 2018, as a result of April 24 call Borgese met with Meehan and Rubenstein (both of SSI) and informed SSI that Borgese and Privitera's company needed to hit pause for a while on the ongoing efforts.  SSI was very upset because they had just signed a 90-day exclusivity contract with their feedstock source.

79.     On May 3, 2018, Borgese and Privitera received opportunity to be a Qualified Person to certify results for public disclosure for a private company doing Lithium Extraction results.  Due to April 24, 2018 Burba/Ashburn call Borgese and Privitera had to turn down opportunity and recommend other parties.

80.     Qualified Person opportunities can be accomplished part time, result in billing of hundreds of consulting hours, and can often lead to much larger opportunities on projects.

81.     On May 3, 2018, Borgese received text from Jerry Rubenstein of SSI stating "It's now been a week since you told me you can't be affiliated with SSI.  You said it was temporary.  Your silence indicates it's permanent.  If I'm wrong let me know otherwise good luck" Borgese calls Meehan and Rubenstein to explain that they are actively trying to work through the details.

82.     On May 5, 2018, Notice of the May 8, 2018 IBAT Board meeting is emailed to the board members including a seven-point agenda.

83.     On May 7, 2018, Burba called Borgese with two topics of conversation.

84.     First, Burba told Borgese that she was at risk for being fired because she had not yet filled out her SEDI profile.

85.     Second, he mentioned that Patrick Meehan from SSI called him on May 4, 2018, regarding a deal between SSI and NAL.  Burba explained that he had reported this to Ashburn and that he was working with Ashburn on a plan to make it happen.

86.     Burba then asked Borgese to call an NAL board meeting.

87.     Borgese then asked Burba about points 1-4 on the agenda for the May 8, 2018 board meeting.  Burba said those items would be discussed at the meeting but would not be put to a vote at the meeting.

88.     On May 7, 2018, as a result of the Burba call, Borgese made calls to Privitera, Rubenstein, Meehan, and Ashburn.

89.     On May 7, 2018, Borgese spoke to Meehan of SSI and Meehan stated that he only reached out to Burba to clarify Burba's position at IBAT and additionally stated that when he reached out to Burba he did not offer to do a deal between SSI and IBAT.

90.     Borgese informed Meehan that Borgese and Privitera were still on pause and would need to talk with IBAT counsel.

91.     Borgese told Ashburn that she was calling on NAL business and that she had been told by Burba that he was approached by Patrick Meehan of SSI.  She explained she wasn't sure given the April 24 discussion if she could discuss future efforts with SSI.

92.     Ashburn said NAL was well within its rights to discuss any items regarding a deal for NAL, internal to NAL.

93.     Borgese told him that she had not heard the deal Burba described and that she would need to hear more from Burba and SSI.  Ashburn said this is fine and NAL should disclose to the board of IBAT if NAL intends to sign a deal with SSI.

94.     Borgese and Ashburn discussed IBAT topics regarding the upcoming board meeting.  Borgese took handwritten notes during the conversation.

95.     Borgese asked Ashburn regarding the Board agenda points 1-4 and Ashburn stated that IBAT would not be voting on any matters only discussing.

96.     On May 8, 2018, the IBAT Board Meeting was held.

97.     Burba stated that he would like the board to stop sending any detailed emails insisting that board matters not be discussed through emails and that no emails should be sent with detailed concerns regarding board meeting.

98.     Burba motioned to increase size of board from five to seven at the next shareholder meeting.  Borgese asked to table the vote for further discussion and then voted no to increasing the size of the board.

99.     Jeremy Ross was discussed regarding whether his involvement in another junior mining company would be a conflict of interest with him becoming an IBAT board member.  Ross was voted onto the IBAT Board and then appointed as a member of the audit committee.

100.    On May 8, 2018, Borgese calls Ashburn.  Ashburn states Anderson would come up with payment plan for NAL.

101.    On May 8, 2018, Borgese calls David Scott and explains Burba and Ashburn each separately said the Board would discuss items 1-4 and not vote on them. Scott said no wonder you had questions because everyone else knew it was up for a vote.

102.   Scott said IBAT should put processes in place to alert board members of upcoming votes and their content, so board members have a chance to discuss amongst themselves.  Scott stated that he would talk to Anderson to come up with a method to put that in place.

103.   Scott also mentioned that he and Anderson were flying to Denver the following day to meet with Burba and Ashburn regarding the powerpoint Scott and Borgese had been putting together with Privitera and Burba's input and fundraising. Borgese asked if she should be there to represent Research and Development and Engineering and Operations, and Scott said that he wasn't sure and to ask Burba.

104.   On May 8, 2018, Burba asked Borgese to set up a conference call to discuss ramifications of SSI deal.

105.   On May 8, 2018, Borgese told Ashburn that she was not planning to abandon the EEA until the other parts of the SEA had been worked out and she had not seen an alternative EEA.

106.   On May 9, 2018, Burba, Ashburn, Scott, and Anderson met live in Denver.  This live participatory event involving all major IBAT players without inviting or even informing Borgese and Privitera.

107.   On May 9, 2018, Burba called Borgese.

108.   Burba said "I am being forced to take measures forward.  I will be forced to take drastic action."

109.   Borgese asked what and Burba said that he would "forcibly separate" Borgese from the company.

110.    Borgese asked what she has done and Burba said Borgese has done multiple things wrong because Borgese has been difficult.

111.    Burba asked if Borgese knew the result of sending in the employment contract to Mackie.

112.    Burba stated that "according to the terms of the employment contract [Christina was] clinging to he could fire her at any point for any reason."

113.    Burba then stated, "here is some feedback from your supervisor."

114.    Burba stated "Be more cooperative when things don't go your way."

115.    When asked for a specific example Burba said "regarding your refusal to give up your employment agreement."

116.    Burba stated to Borgese "if you were more agreeable then people would want to work with you."

117.    Burba said "speaking as your supervisor engaging in manipulative behavior where you twist people around me to get what you want done.  It is not becoming."

118.    Burba stated that he will be forced to fire [Borgese] if [she does] not give up the EEA.

119.    On May 11, 2018, NAL conducted a Board Call.

120.    Burba said he spoke with Meehan of SSI last Saturday.  Burba said Meehan asked if there is any way SSI can work with NAL and Burba said it was always understood that the Imperial Valley is always something where we want to be involved.

121.   Burba told Borgese and Privitera he had worked out a plan with Ashburn for NAL and SSI do a deal together and Burba detailed specific aspects of the resulting plan including putting his work in a blind trust, percent ownership of SSI, and that Borgese and/or Privitera could stay in their IBAT roles unless they were on the board of SSI in which case whoever was on the SSI board could not be an officer or VP of IBAT.

122.   Burba asked Privitera to reach out on behalf of NAL.  Privitera said he would reach out independently as Borgese and Privitera's company was owed money from SSI and Burba and Borgese agreed.

123.   Burba said that he had an obligation to take this to the board.  Borgese said she had already informed John Ashburn of this topic from Burba's last call and asked if she needed to do anything else with respect to informing IBAT and Burba said no.

124.   Burba said another option was to do the SSI project through IBAT rather than NAL if preferred.

125.   Borgese typed the Board meeting summary and sent to Burba, Privitera, and a courtesy copy to Ashburn and received email responses back from all three. Burba's responses included many items including that the project was listed as a "Carveout" during the NAL IBAT negotiation.

126.   Borgese and Privitera already knew from previous discussions with SSI that SSI no longer had interest in working with Burba through NAL and was never interested in working with IBAT.

127.   On May 11, 2018, Burba and Borgese had a phone call.

128.   Burba stated that "working with [Borgese and Privitera] have been the most miserable two years of [his] life."

129.   Burba stated that "He has had enough."

130.   Burba said "he refuses to be paid something not owed to him, that the effort to recoup the direct costs was dishonest."

131.   Burba asked Borgese "if she wanted to blow everything up."

132.   Burba told Borgese "that she is playing a dangerous game".

133.   Burba stated that his strong desire was to do everything together.

134.   Borgese then asked why then he was telling her that it was the most miserable two years of his life and why he has threatened to fire her twice so far.

135.   Burba said he could fire Christina at any time for any reason because her employment contract was at will.

136.   Burba stated "when he took his technology to [Privitera and Borgese] and suggested they form a company his opinion of [Privitera and Borgese] was at the peak of Mount Everest.", "Trying to do a contract with [Borgese] was impossible", and that he doubted that he and Borgese could work together.

137.   Christina stated that Burba did not bring his technology to herself and Privitera and suggest forming NAL, that Privitera brought it to Burba.

138.   Burba stated that he has evidence to the contrary.

139.   Borgese asked for such evidence and Burba said he would only ever share it if it was needed.

140.   Borgese stated that she felt they could continue to work together.

141.   Burba stated that he never realized that when he brought his technology to Borgese and Privitera he would always be outvoted two to one.

142.   Borgese stated that every NAL Resolution has passed unanimously and the only time when one almost did not pass unanimously was when Borgese disagreed with Privitera and Burba on an issue and they were voting yes, and she went along with it to keep unity.

143.   On May 14, 2018, IBAT had a special board meeting.  All board members were in attendance except Jeremy Ross

144.   On May 14, 2018, Borgese and Privitera received an email from Tony Williams of SSI with technical questions.  Borgese told Tony Williams that we were still on pause.

145.   On May 30, 2018, IBAT Board Meeting.  Borgese, Burba, Anderson, Scott, and Ashburn in attendance.  Ross is not in attendance.

146.   The Year End Financial Statements and Management's Discussion and Analysis had been submitted to the Board for review from the IBAT audit committee at 10:56 AM and contained information that was not factually accurate.

147.   Upon review, Borgese called and emailed back and forth with Anderson and Ashburn in an effort present factually accurate information to the auditors and prepared the document titled "Updated and Corrected Facts for Financial Statement and MDA – Rev A – May 30, 2018" and submitted it to the IBAT Board at 12:54 PM.

148.   The Board meeting began at 1:30 and Anderson stated that the auditors would incorporate the changes Borgese documented within the hour.  Borgese made a motion to table the meeting for one hour to allow the auditors time to make the changes and her motion did not pass.

149.    Burba made the motion "We accept the changes to the documents from the audit committee whether or not they accurately reflect the facts" and asked for a second.  Ashburn stopped the motion, and recommended wording for a new motion.

150.    Borgese voted no with comments and officially requested that the initial motion made by Burba be recorded in the minutes.  Ashburn stated that he did not feel including the motion in the minutes necessary.

151.    On May 30, 2018, Evening after board meeting Anderson emails Burba "I have never been through anything like this in my life!  We need her to go !!" referring to Borgese.

152.    IBAT never paid Borgese and Privitera the salaries for the term of their employment.

153.    On June 29, 2018, IBAT Board Meeting held.

154.    Burba made a motion to rescind the May 8, 2018 motion to increase the number of Board members to seven at the Annual General Meeting.

155.    Borgese asked for justification and Burba responded that the Board has been unable to find suitable director candidates to fill the slate. When asked he stated that he has not created a search committee and has not informed all current Board members of an ongoing search for qualified candidates.

156.    Borgese asked Burba his plan to keep the board in compliance with the upcoming board commitments to bring Marc Privitera onto the board and to keep the two independent director requirements for the audit committee Ashburn stated, "we will

figure it out when we get there and we can always increase the board to six without presenting it at the AGM".

157.   Burba's new EEA signed by Burba and Ashburn on June 26, 2018 was presented to the Board for approval.

158.   Borgese and Privitera were never presented with an alternative EEA.

159.   On June 29, 2018, at 4:15 PM PST Borgese receives termination letter by email from IBAT, Exhibit 5.

160.   On June 29, 2018, at 4:20 PM PST Privitera receives termination letter by email from IBAT, Exhibit 6.

161.   The termination emails for Borgese and Privitera gave reasons for termination that were either not true or that were expressly allowed under the EEA.

162.   On July 4, 2018, Ashburn sends IBAT Board "Management Information Circular for the Annual General Meeting of Shareholders to be Held on August 14, 2018" which includes the nominations for individuals for IBAT's Board of Directors.  Privitera and Borgese are not listed on the board candidate slate.

163.   On July 4, 2018, Borgese responds with an email to the IBAT Board and Ashburn informing the Board that she is "aware of contractual obligations the company has made which are in dispute of the contents of the [Circular].  The dispute is as follows:

1. [NAL] has the right to nominate 51% of the board of IBAT asper the terms of the SEA.  2. The proposed candidate slate in the Circular does not reflect NAL's nomination rights.   3. I am aware that NAL would like to exercise their nomination rights."

164.    On August 3, 2018, Borgese and Privitera each receive a cashier's check from IBAT which was identified by IBAT as a payroll check (Exhibit 7).

165.    On October 17, 2018, IBAT applies for patent application P180103014 which lists Burba as the inventor.

166.    On October 25, 2018, IBAT applies for patent application 16171109 which lists Burba as the inventor, 3080499 which does not indicate inventor or application date, 2018354320 which lists Burba as the inventor, WO/2019/084311 which lists Burba as the inventor.

167.    Patent applications that do not list Borgese and Privitera are nonjoiner because they cover Borgese and Privitera's invention and they do not list them as inventors.

168.    Patent applications listing Burba as an inventor could be a misjoiner depending on the claims.

169.    Patent applications do not limit IBAT's use of intellectual property to oilfield brine applications.   Borgese and Privitera have rights to the patents outside oilfield use.

170.    On November 8, 2018, IBAT announces license agreement between IBAT and Ensorcia Metals and its subsidiary Sorcia Minerals where IBAT will license its novel lithium extraction technology for use in extracting lithium carbonate from lithium bearing brine sources in Chile.

171.    Lithium bearing brine sources in Chile are typically not oilfield brines.

172.    The SEA does not allow assignment of the Agreement without prior written consent of all parties, Section 15.7.

173.    On May 31, 2019, IBAT's public disclosure statement Management Discussion and Analysis state that payments to former members of management (Borgese and Privitera) were for severance.  The document references "Severance" five times and specifically makes a separate distinction between Severance from that of Salaries and Benefits.

174.    Borgese and Privitera have been unable to deposit the shares from Section 2.2 (b) (iv) with any major firm including TD Ameritrade, Etrade, Wells Fargo, and Charles Schwab.

175.    IBAT has not delivered Borgese and Privitera the original share certificates pursuant to SEA Section 2.2 (a) of 1,566,667 and 1,566,666 shares respectively.  IBAT delivered copies and purported them to be originals but when IBAT's transfer agent reviewed them they informed Borgese and Privitera that they were copies.

176.    IBAT has not delivered Borgese and Privitera the share certificates pursuant to SEA Section 2.2 (b) (i-iii) of 5,024,330 and 5,024,332 shares respectively.

177.    IBAT did not issue Quarterly Royalty Payments for Q2, Q3, Q4 2018; Q1, Q2, Q3, Q4 2019; Q1, Q2, Q3, Q4 2020; and an anticipatory breach of Q1 2021.

178.    IBAT did not deliver NAL the Royalty Notice including a notice setting out the amount of the Royalty Payment owing, and the Conversion price for quarters Q2, Q3, Q4 2018; Q1, Q2, Q3, Q4 2019; Q1, Q2, Q3, Q4 2020; and an anticipatory breach of Q1 2021.

179.   IBAT has received proceeds from the issuance of shares in a variety of forms including but not limited to shares, stock options, and purchase warrants.  These shares are a saleable material.

180.   IBAT did not issue Borgese and Privitera stock options to which they are entitled to participate pursuant to SEA Section 2.2.  From public information Burba has been granted at least 5,698,500 stock options at exercise prices at CAD $0.19 and CAD $0.38.

181.   On April 14, 2021, IBAT's revamped website utilizes charts and block flow diagrams developed by Borgese and Privitera, highlights the mobile lithium extraction process, and references "IBAT's novel process and control system", "modular plant design", and "Dr. Burba's original invention."

182.   As a result of IBAT's actions, Borgese, Privitera and NAL have suffered damages.


**FIRST CAUSE OF ACTION**

**Breach of Borgese Employment Agreement against IBAT**

183.   Borgese incorporates the allegations above as if fully stated herein.

184.   The Executive Employment Agreements are enforceable agreements supported by consideration and governed by the laws of Colorado.

185.   Borgese performed her obligations to IBAT under the Executive Employment Agreement.

186.   At least one Change of Control as defined in EEA Exhibit A (Exhibit 3 in Complaint) had occurred in the 24 months prior to Borgese's termination.

187.   By engaging in the conduct described above, IBAT has violated the contractual obligations to Borgese. The breaches include, but are not limited to:

a.   Non-payment of base salary described in EEA Section 3(a),

b.   Non-payment of severance described in EEA Section 5,

c.   Non-payment of bonus as described in EEA Section 5,

d.   Failure to provide employee benefits and, non-payment of accrued benefits described in EEA Sections 3(b) and 5,

e.   Failure to provide participation in employee bonus plans and long-term equity or cash incentive compensation plans described in EEA Section 3(c),

f.   Preventing Borgese from engaging in Outside Work as described in EEA Section 2(b), and

g.   Appropriated Executive's Intellectual Property without authorization as described in EEA Section 2(c) and without payment of consideration.

188.   As a direct and proximate result of IBAT's violations of the contractual obligations to Borgese, Borgese has suffered and will continue to suffer irreparable harm and monetary damages.

## SECOND CAUSE OF ACTION

### Breach of Privitera Employment Agreement against IBAT

189.   Privitera incorporates the allegations above as if fully stated herein.

190.   The Executive Employment Agreements are enforceable agreements supported by consideration and governed by the laws of Colorado.

191.   Privitera performed his obligations to IBAT under the Executive Employment Agreement.

192.   At least one Change of Control as defined in EEA Exhibit A (Exhibit 4 in Complaint) had occurred in the 24 months prior to Privitera's termination.

193.   By engaging in the conduct described above, IBAT has violated the contractual obligations to Privitera. The breaches include, but are not limited to:

    a.   Non-payment of base salary described in EEA Section 3(a),

    b.   Non-payment of severance described in EEA Section 5,

    c.   Non-payment of bonus as described in EEA Section 5,

    d.   Failure to provide employees benefit plans and non-payment of accrued benefits described in EEA Sections 3(b) and 5,

    e.   Failure to provide employee bonus plans and long-term equity or cash incentive compensation plans described in EEA Section 3(c),

    f.   Preventing Privitera from engaging in Outside Work as described in EEA Section 2(b), and

    g.   Appropriated Executive's Intellectual Property without authorization as described in EEA Section 2(c) and without payment of consideration.

194.   As a direct and proximate result of IBAT's violations of the contractual obligations to Privitera, Privitera has suffered and will continue to suffer irreparable harm and monetary damages.

## **THIRD CAUSE OF ACTION**

### **Breach of Share Exchange Agreement against IBAT**

195.   NAL incorporates the allegations above as if fully stated herein.

196.   The Share Exchange Agreement ("SEA") is an enforceable agreement supported by consideration and governed by the laws of Colorado.

197.   NAL performed its obligations to IBAT under the SEA.

198.   By engaging in the conduct described above, IBAT has violated the contractual obligations to NAL. The breaches include, but are not limited to:

a.   Non-payment of defined direct costs and fees accrued by NAL since the signing of the BeiSur Agreement in violation of SEA Sections 2.3(d), 5.2(c), 5.2(i), 5.2(p) and 6,

b.   Payment to non-designee,

c.   Non-payment of Quarterly Royalty Payments, in violation of Section 2.4 and Schedule C,

d.   Prevented NAL from electing Conversion Price for Quarterly Royalty Payments in violation of Schedule C,

e.   Failure to create of advisory board "to oversee the development and implementation of lithium extraction and processing technology" where two of three positions are to be appointed by NAL as described in SEA Section 3.3,

f.  Prevented NAL from overseeing the development and implementation of the intellectual property,

g.  Prevented NAL from nominating 51% of IBAT Board seats, and

h.  Licensing of technology to other parties.

199.  As a direct and proximate result of IBAT's violations of the contractual obligations to NAL, NAL has suffered and will continue to suffer irreparable harm and monetary damages.

## FOURTH CAUSE OF ACTION

**Breach of Contract Share Exchange Agreement against IBAT**

**By the Holders of Shares Issued by SA Lithium, Borgese and Privitera**

**("Borgese and Privitera")**

200.  Borgese and Privitera incorporate the allegations above as if fully stated herein.

201.  The Share Exchange Agreement, ("SEA") is an enforceable agreement supported by consideration and governed by the laws of Colorado.

202.  Borgese and Privitera performed their obligations to IBAT under the SEA.

203.  By engaging in the conduct described above, IBAT has violated the contractual obligations which include breaches as follows:

a.  Failure to deliver original share certificates to Borgese and Privitera for 1,566,667 and 1,566,666 shares respectively in violation of SEA Section 2.2(a),

b. Failure to issue Vend-In Shares to Borgese and Privitera of 5,024,330 and 5,024,332 shares respectively in violation of SEA Section 2.2(b) (i-iii) and Schedule A,

c. Failure to issue Stock Option Plan shares in violation of SEA Section 2.2., estimated to be 5,698,500 to each Borgese and Privitera,

d. Failure to grant additional stock option participation in violation of SEA Section 3.2(a),

e. Preventing Borgese and Privitera the right "to oversee the development and implementation of lithium extraction and processing technology" via appointment to advisory board roles, and

f. Preventing Borgese and Privitera the right to nominate individuals to fill the "EVP Engineering and Operations and EVP Research and Development positions" in violation of SEA Section 3.4.

204.   As a direct and proximate result of IBAT's violations of the contractual obligations to Borgese and Privitera, Borgese and Privitera have suffered and will continue to suffer irreparable harm and monetary damages.

## FIFTH CAUSE OF ACTION

**Tortious Interference with Prospective Business Relations against Burba and IBAT by Borgese and Privitera**

205.   Borgese and Privitera incorporate the allegations above as if fully stated herein.

206.   Burba and IBAT intentionally and improperly interfered with and continues to intentionally and improperly interfere with Borgese and Privitera's ongoing and prospective business relations.

207.   Borgese and Privitera had ongoing and prospective business relations with Salton Sea Industries ("SSI").

208.   Borgese and Privitera had ongoing and/or prospective business relations with other business opportunities including but not limited to Qualified Person opportunity and Paul Austin.

209.   Burba and IBAT knew or reasonably should have known of Borgese and Privitera's ongoing and prospective business relations with SSI because Burba spoke about the deals and secured an opportunity for himself.

210.   IBAT also knew or reasonably should have known of Borgese and Privitera's ongoing and prospective business relations with SSI because the intellectual property acquired by IBAT was limited to "lithium extraction from oil-field brines", and EEA Section 7 excluded work done on geothermal sources in the Imperial Valley from competitive conduct.

211.   Burba and IBAT's interference with the above matters was intentional, improper and without authorization.

212.   As a proximate result of Burba and IBAT's actions and interference, Borgese and Privitera have suffered and continue to suffer damages in an amount to be determined at trial and will include attorney fees and costs of litigation pursuant.

## SIXTH CAUSE OF ACTION

### Breach of Contract against Burba

### By NAL

213.   NAL incorporate the allegations above as if fully stated herein.

214.   NAL is an S corporation and is governed by the NAL Shareholders Agreement dated August 5, 2016, Exhibit 8 ("NAL Agreement"),

215.   NAL Agreement requires the shareholders to provide capital contributions to NAL if additional funds are required to meet NAL's obligation in Section 9.

216.   The NAL Shareholders, Borgese, Privitera, and Burba share equally in contribution to a capital call.

217.   Since August 2018 Burba has failed to provide capital to support the operations of NAL.

218.   NAL sent Burba a request for a capital contribution for his share of the NAL expenses.

219.   Burba failed to provide a capital contribution to NAL.

220.   As a direct and proximate result of Burba's violations of the contractual obligations to NAL, NAL has suffered and will continue to suffer monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Christina M. Borgese, Marc Privitera, and North American Lithium, Inc., respectfully request that the Court:

A.   Award monetary damages to Plaintiffs in an amount to be proven at trial,

B.   Award payment of defined direct costs and/or fees that have been accrued by NAL since the singing of the BeiSur Agreement,

C.      Base salary, severance, waiting time penalties, bonus, benefits, bonus plans and long-term equity or cash incentive compensation plans, and associated interest,

D.      IBAT shares,

E.      Stock options and those going forward,

F.      Past due royalties to NAL,

G.      Past due and future timely Quarterly Royalty Notices, Conversion Price, and Annual Royalty Notices,

H.      Share certificates and stock options in a format that will ensure deposit with a major brokerage firm such as TD Ameritrade, Charles Schwab, or Wells Fargo to enable Plaintiffs to market the securities,

I.      51% of IBAT Board seats to NAL,

J.      NAL appointment of two of three members of IBAT advisory board with appropriate compensation,

K.      Right to fill positions of IBAT Executive VP Engineering and Operation and Executive VP of Research and Development with compensation,

L.      Borgese and Privitera's names on patent applications and/or patents and compensation for unjust actions in filing,

M.      License, assignment, and/or ownership to Borgese and Privitera of patent applications and/or patents unencumbered for any use not pertaining to lithium extraction from oilfield brines,

N.      Damages for IBAT's use of the assigned intellectual property outside of the manner of oilfield brines,

O.     Award of damages for IBAT's licensing of technology to parties,

P.     Payment of money owing from Burba to NAL for ongoing costs,

Q.     Award Plaintiffs damages for IBAT's blocking them from their right to oversee development and implementation of their technology,

R.     Interest as appropriate,

S.     Plaintiff's attorney fees as required by the Executive Employment Agreement and the Share Exchange Agreement, and

T.     Such equitable relief as is just and proper.

Dated this 23rd day of April, 2021.

                         Respectfully submitted,

                         **MINOR & BROWN, P.C.**

                         *Duly signed original on file at*
                         *Minor & Brown, P.C.*


                         */s/ Kim L. Ritter*
                         Kim L. Ritter, Esq., #22725
                         Minor & Brown, P.C.
                         650 S. Cherry St., Ste. 1100
                         Denver, Colorado 80246
                         ***Attorney for Plaintiffs Christina M.***
                         ***Borgese, Marc Privitera and North***
                         ***American Lithium, Inc.***


**Plaintiffs' Addresses:**
Christina M. Borgese – 6190 Yardley Lane, San Ramon, CA 94582.
Marc Privitera – 214 Los Banos Avenue, Walnut Creek, CA 94598.
North American Lithium, Inc. – 6190 Yardley Lane, San Ramon, CA 94582.