**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 21-cv-01134-NYW-KAS

CHRISTINA M. BORGESE,
MARC PRIVITERA, and
NORTH AMERICAN LITHIUM, INC.,

     Plaintiffs/Counter-Defendants,

v.

INTERNATIONAL BATTERY METALS, LTD.,

     Defendant/Counter-Plaintiff.

---

**MEMORANDUM OPINION AND ORDER**

---

This matter is before the Court on the following motions:

(1) Plaintiffs' Verified Motion for Bifurcation of Trial Pursuant to Fed. R. Civ. P. 42(b) (the "Motion to Bifurcate"), [Doc. 86, filed October 3, 2023];

(2) Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Motion"), [Doc. 96, filed November 22, 2023];

(3) Defendant's Motion for Partial Summary Judgment ("IBAT's Motion"), [Doc. 98, filed November 22, 2023]; and

(4) Plaintiffs' Motion for Leave to File a Sur-reply Brief in Opposition to Internation [sic] Battery Metals Ltd.'s Motion for Partial Summary Judgment (the "Motion to File Sur-Reply"), [Doc. 117, filed January 16, 2024].

The Court concludes that oral argument would not materially assist in the resolution of these matters. Upon careful review of the instant Motions and corresponding briefing, the entire case file, and the applicable case law, the Court respectfully **GRANTS**

**IN PART** and **DENIES IN PART** IBAT's Motion, **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion, **DENIES** the Motion to Bifurcate, and **DENIES** the Motion to File Sur-Reply.

## BACKGROUND[1]

This case centers on various business relationships among Plaintiffs Christina Borgese ("Ms. Borgese"), Marc Privitera ("Mr. Privitera," and together with Ms. Borgese, the "Individual Plaintiffs"), and North American Lithium, Inc. ("NAL," and together with the Individual Plaintiffs, "Plaintiffs") and Defendant International Battery Metals, Ltd. ("IBAT" or "Defendant"). The Individual Plaintiffs and IBAT's CEO, John Burba ("Mr. Burba"), are equal owners of NAL. The Individual Plaintiffs were previously employed by IBAT.

In March 2018, IBAT, NAL, Selective Adsorption Lithium, Inc. ("SA Lithium"), and SA Lithium's Shareholders (Ms. Borgese and Mr. Privitera) entered into a Share Exchange Agreement ("SEA"). The SEA provided for an exchange of shares of IBAT for 100% of the shares of SA Lithium, including certain intellectual property to be held by SA Lithium, royalty payments from IBAT to NAL, cash payments from IBAT to NAL, and shares of stock and stock options from IBAT to Ms. Borgese, Mr. Privitera, and Mr. Burba. Under the terms of the SEA, SA Lithium became wholly owned by IBAT.

Following the execution of the SEA, IBAT hired Ms. Borgese, Mr. Privitera, and Mr. Burba as employees pursuant to individual Executive Employment Agreements ("EEAs"). On April 13, 2018, Mr. Burba became the President, CEO, and Chairman of the Board of IBAT; Ms. Borgese became the Executive Vice President of Engineering and Operations

---

[1] Unless otherwise specified, these background facts are drawn from Plaintiffs' Complaint. *See generally* [Doc. 1].

and a member of IBAT's Board; and Mr. Privitera became IBAT's Executive Vice President of Research and Development. Within weeks, Mr. Burba and IBAT's chief legal officer, John Ashburn, contacted Ms. Borgese and Mr. Privitera regarding fiduciary duty and conflict-of-interest issues arising from carveout provisions in their EEAs. Central to the Parties' dispute is whether the Individual Plaintiffs could pursue consulting opportunities with Salton Sea Industries, Inc. ("SSI"), independent of IBAT, pursuant to the EEA carveout provisions but without violating the Individual Plaintiffs' duties not to usurp corporate opportunities. *See* [Doc. 1; Doc. 28; Doc. 29; Doc. 34]. The Parties' relationship devolved and, on June 29, 2018, Ms. Borgese and Mr. Privitera received termination letters from IBAT.

Plaintiffs initiated this action by filing a Complaint on April 23, 2021, alleging four causes of action against IBAT for breaches of the EEAs and SEA: (1) breach of the Borgese EEA against IBAT ("Claim 1"); (2) breach of the Privitera EEA against IBAT ("Claim 2"); (3) breach of the SEA against IBAT by NAL ("Claim 3"); and (4) breach of the SEA against IBAT by the Individual Plaintiffs, as SA Lithium Shareholders ("Claim 4"). *See* [Doc. 1 at 23–27]. Plaintiffs proceed on each of the breach of contract claims on various theories. *See id.* For purposes of clarity, the Court finds it necessary and appropriate to define Plaintiffs' claims and theories as articulated in the Complaint.

***Claims 1 and 2.*** With respect to Claims 1 and 2, Ms. Borgese and Mr. Privitera each allege that IBAT violated their respective EEAs by:

   a.   Non-payment of base salary described in EEA Section 3(a),

   b.   Non-payment of severance described in EEA Section 5,

   c.   Non-payment of bonus as described in EEA Section 5,

    d.   Failure to provide employee benefits and[] non-payment of accrued benefits described in EEA Sections 3(b) and 5,

    e.   Failure to provide participation in employee bonus plans and long-term equity or cash incentive compensation plans described in EEA Section 3(c),

    f.   Preventing [the Executive] from engaging in Outside Work as described in EEA Section 2(b), and

    g.   Appropriat[ing] [the] Executive's Intellectual Property without authorization as described in EEA Section 2(c) and without payment of consideration.

[*Id.* at ¶¶ 187, 193].  The Court will refer to each of the foregoing theories as Claims 1(a) through (g) and Claims 2(a) through (g), respectively.

    ***Claim 3.***  With respect to Claim 3, NAL alleges that IBAT breached the SEA by:

    a.   Non-payment of defined direct costs and fees accrued by NAL since the signing of the BeiSur Agreement in violation of SEA Sections 2.3(d), 5.2(c), 5.2(i), 5.2(p)[,] and 6,

    b.   Payment to non-designee,

    c.   Non-payment of Quarterly Royalty Payments, in violation of Section 2.4 and Schedule C,

    d.   Prevent[ing] NAL from electing Conversion Price for Quarterly Royalty Payments in violation of Schedule C,

    e.   Failure to create [an] advisory board "to oversee the development and implementation of lithium extraction and processing technology" where two of three positions are to be appointed by NAL as described in SEA Section 3.3,

    f.   Prevent[ing] NAL from overseeing the development and implementation of the intellectual property,

    g.   Prevent[ing] NAL from nominating 51% of IBAT Board seats, and

    h.   Licensing of technology to other parties.

[*Id.* at ¶ 198].  The Court will refer to the foregoing theories asserted by NAL under Claim 3 as Claims 3(a) through (h), respectively.

*Claim 4.*   With respect to Claim 4, the Individual Plaintiffs allege that IBAT breached the SEA by:

a.   Fail[ing] to deliver original share certificates to Borgese and Privitera for 1,566,667 and 1,566,666 shares respectively in violation of SEA Section 2.2(a),

b.   Fail[ing] to issue Vend-In Shares to Borgese and Privitera of 5,024,330 and 5,024,332 shares respectively in violation of SEA Section 2.2(b) (i–iii) and Schedule A,

c.   Fail[ing] to issue Stock Option Plan shares in violation of SEA Section 2.2[], estimated to be 5,698,500 to each Borgese and Privitera,

d.   Fail[ing] to grant additional stock option participation in violation of SEA Section 3.2(a),

e.   Preventing [sic] Borgese and Privitera the right "to oversee the development and implementation of lithium extraction and processing technology" via appointment to advisory board roles, and

f.   Preventing [sic] Borgese and Privitera the right to nominate individuals to fill the "EVP Engineering and Operations and EVP Research and Development positions" in violation of SEA Section 3.4.

[*Id.* at ¶ 203].[2]  The Court will refer to the foregoing theories asserted under Claim 4 as Claims 4(a) through (f).

IBAT filed its Counterclaims against the Individual Plaintiffs for (1) usurpation of corporate opportunity and (2) tortious interference with prospective contractual relations on April 22, 2022.  [Doc. 28 at 5–6].  On May 12, 2022, Ms. Borgese and Mr. Privitera filed their Answer and Affirmative Defenses to IBAT's Counterclaims.  [Doc. 29].  IBAT then filed an Answer on July 18, 2022, identifying its breach of contract theories against

---

[2] Plaintiffs also asserted two claims against Mr. Burba and IBAT for tortious interference with prospective business relations ("Claim 5"), [Doc. 1 at 28–29]; and breach of contract against Mr. Burba by NAL ("Claim 6"), [*id.* at 30].  Claims 5 and 6 were dismissed, ultimately with prejudice, due to Plaintiffs' failure to state a claim.  [Doc. 30 at 14]. Subsequently, this action was reassigned to the undersigned judicial officer upon her appointment as a district judge.  [Doc. 42].

Ms. Borgese and Mr. Privitera as affirmative defenses after the Court's dismissal of Claims 5 and 6.  [Doc. 34 at 18–19].

This case proceeded through discovery, which closed on September 15, 2023. [Doc. 79].[3]  Plaintiffs filed their Motion to Bifurcate on October 3, 2023, essentially seeking to reserve certain claims for a different lawsuit, and that motion has been fully briefed. [Doc. 86; Doc. 90; Doc. 93].  The Parties then filed their respective Motions for Summary Judgment on November 22, 2023, [Doc. 96; Doc. 98], which have also been fully briefed, *see* [Doc. 104; Doc. 106; Doc. 115; Doc. 116].  Plaintiffs subsequently filed their Motion for Leave to File Sur-Reply, [Doc. 117], IBAT filed a Response, [Doc. 120], and Plaintiffs filed a Reply, [Doc. 121].  The Motions are thus ripe for disposition.

## MOTIONS FOR SUMMARY JUDGMENT

### I.    Legal Standards

*Rule 56 of the Federal Rules of Civil Procedure.*  Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).  It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for

---

[3] Discovery was later extended through October 6, 2023, [Doc. 85], and November 10, 2023, [Doc. 89], but only for the sole purpose of completing a handful of depositions.

trial.  *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  At all times, the Court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."  *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016) (quotation omitted).

In addition, "[c]ross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party."  *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019); *see also Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

***Principles of Contract Interpretation.***  Because this Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, *see* [Doc. 1 at ¶ 1], the Court applies the substantive law of the forum state, *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994).  Generally, under Colorado law, contract interpretation is a question of law requiring application of well-settled principles of contract interpretation to the facts.  *Rich v. Ball Ranch P'ship*, 345 P.3d 980, 983 (Colo. App. 2015).  It is well established that courts have no authority to rewrite contracts and must enforce unambiguous documents according to their terms.  *McShane v. Stirling Ranch Prop. Owners Ass'n*, 393 P.3d 978, 982 (Colo. 2017).

In interpreting contracts, the Court aims to "discern and effectuate the parties' intent."  *Sch. Dist. No. 1 in Cnty. of Denver v. Denver Classroom Tchrs. Ass'n*, 433 P.3d 38, 41 (Colo. 2019).  To do so, the Court "'should give effect to the plain and generally accepted meaning of the contractual language,' while also 'examining the entire

7

instrument without viewing clauses or phrases in isolation.'" *Platt v. Winnebago Indus., Inc.*, 960 F.3d 1264, 1270 (10th Cir. 2020) (alteration omitted) (quoting *Copper Mtn., Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009)); *see also Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (contract terms "must be examined and construed in harmony with [their] plain and generally accepted meaning" (quotation omitted)).  If "a written contract is complete and free from ambiguity, [the Court] will deem it to express the intent of the parties, and [the Court] will enforce it according to its plain language." *In re United W. Bancorp, Inc.*, 959 F.3d 1269, 1273 (10th Cir. 2020) (quoting *Klun v. Klun*, 442 P.3d 88, 92 (Colo. 2019)).   Indeed, the Court "must enforce an unambiguous contract in accordance with the plain and ordinary meaning of its terms." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1273 (10th Cir. 2018) (quotation omitted).  "The mere fact that the parties differ on their interpretations of an instrument does not of itself create an ambiguity." *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990).

## II.   Undisputed Material Facts

The Court identifies the following undisputed material facts from the record before it:

1.      In 2016, Ms. Borgese, Mr. Privitera, and Mr. Burba formed NAL.  [Doc. 96-1 at 18:5–15; Doc. 1-8; Doc. 96 at ¶ 1; Doc. 106 at ¶ 1].[4]

---

[4] When citing deposition transcripts, the Court will cite to the page number in the transcript as opposed to the page number generated by the CM/ECF system.

2.     NAL entered into a Master Services Agreement with BeiSur Ostbarat Agency Ltd. ("BeiSur Agreement") on or about March 23, 2017.  [Doc. 106-4 at 2, 12; Doc. 96-1 at 176:22–177:1; Doc. 96 at ¶ 7; Doc. 106 at ¶ 7].

3.     Pursuant to the BeiSur Agreement and among other action items, NAL was to develop certain deliverables for BeiSur in connection with a lithium extraction project. *See generally* [Doc. 106-4]; *see also* [Doc. 96-4 at 1; Doc. 96 at ¶ 7; Doc. 106 at ¶ 7].

4.     Many of NAL's invoices under the BeiSur Agreement went unpaid.  [Doc. 96-5 at 70:21–24; Doc. 96 at ¶ 8; Doc. 106 at ¶ 8].

**A.     The Letter of Intent**

5.     In 2017, NAL entered into a letter of intent ("LOI") with IBAT for the sale of NAL's intellectual property relating to the extraction of lithium from oil field brines.  [Doc. 96-1 at 180:8–17; Doc. 96-6 at 1; Doc. 96 at ¶ 10; Doc. 106 at ¶ 10].

6.     The LOI required IBAT to make several payments to NAL upon IBAT's receipt of certain deliverables from NAL.  Specifically, Section 1.3(d) of the LOI required IBAT to make the following payments:

    a.  $135,000 upon signing of the LOI "to review data from oil field brines and analyze the data to prepare a brine source identification report (the 'Brine Identification Report')";

    b.  $175,000 upon delivery of the report within the earlier of 30 days after the date of the LOI or the five days after the date IBAT "receives net proceeds from an equity financing in the amount of not less than CAD$1,000,000";

    c.  $215,000 upon delivery of a block flow diagram of the lithium extraction process under SOW1A (the "Block Flow Diagram") to be used for the proposed transaction with IBAT;

    d.  $225,000 upon delivery of an initial overall project flowchart and design document (the "Project Flowchart"); and

    e.  $125,000 upon delivery of the final opinion letter under SOW1A (the "Final Report").

[Doc. 96-6 at 3 § 1.3(d); Doc. 96 at ¶ 11; Doc. 106 at ¶ 11].

**B.      The Share Exchange Agreement**

7.      The Parties' negotiations in connection with the LOI resulted in execution of the SEA between Ms. Borgese, Mr. Privitera, Mr. Burba, NAL, SA Lithium, and IBAT on March 4, 2018, with an amendment to the SEA effective on April 12, 2018.  [Doc. 96-1 at 187:1–13; Doc. 114-1 at 1; Doc. 98-11; Doc. 96 at ¶ 12; Doc. 106 at ¶ 12].

8.      The SEA closed on April 12, 2018.  [Doc. 96-2 at ¶ 4; Doc. 96 at ¶ 13; Doc. 106 at ¶ 13].[5]

i.      Shares-Related Claims

9.      The SEA required IBAT to issue three sets of shares:  (1) a set of initial shares issued shortly after closing under Section 2.2(a); (2) shares issued upon various patent filings pursuant to Section 2.2(b)(i)–(iii); and (3) shares issued upon completion of financing pursuant to Section 2.2(b)(iv).  [Doc. 98-11 at 14 § 2.2(b); Doc. 98 at ¶ 16; Doc. 104 at 3 ¶ 16].

10.      IBAT subsequently issued the shares related to the patent-filing milestones under Section 2.2(b)(i)–(iii).  [Doc. 98-11 at 14, 33 §§ 2.2(b), 8.3(f); Doc. 98 at ¶ 19; Doc. 104 at 4 ¶ 19; Doc. 116 at ¶ 19].

---

[5] IBAT denies that Plaintiffs "performed their obligations under the SEA," [Doc. 96 at ¶ 13], because "Plaintiffs undermined the transfer of intellectual property to IBAT by filing competing patents" and "refused to execute updated EEAs as required by SEA Section 5.5," [Doc. 106 at ¶ 13].  Because IBAT does not deny that the SEA closed on April 12, 2018, the Court considers this fact undisputed.  *Compare* [Doc. 96 at ¶ 13], *with* [Doc. 106 at ¶ 13].

ii.  Stock Option Claims

11.     The SEA says that the Individual Plaintiffs shall be allowed to participate in the "Company's Stock Option Plan" when "such shares are available."  [Doc. 98-11 at 15 § 2.2(b); Doc. 98 at ¶ 24; Doc. 104 at 4 ¶ 24].

12.     IBAT's Stock Option Plan states that the Board may issue shares "in its discretion" and administer the plan with "sole and absolute discretion."  [Doc. 98-18 at 6 § 1.4; Doc. 98 at ¶ 25; Doc. 104 at 4 ¶ 25].

13.     The Board has never issued Stock Options to Plaintiffs.  [Doc. 98-1 at ¶ 7; Doc. 98 at ¶ 26; Doc. 104 at 4 ¶ 26].

iii.  Reimbursement Claims

14.     Section 2.3(d) of the SEA contained a provision requiring IBAT to repay certain fees and expenses incurred by NAL, specifically requiring:

> Payment from IBAT and/or the Resulting Issuer to [NAL] and/or [NAL]'s designee for any other defined direct costs and/or fees that have been accrued by [NAL] since the signing of the BeiSur Agreement, including any such costs for this Agreement.  For the sake of clarity, such costs include, but are not limited to, legal fees accrued by [NAL] in conjunction with the BeiSur Agreement and this Agreement and direct costs paid by [NAL] for services in conjunction with the BeiSur Agreement and this Agreement. Payments under this section of this Agreement shall be made as priority payments from IBAT and/or the Resulting Issuer to [NAL] and/or [NAL]'s designee every thirty (30) days after the Time of Closing until all defined direct costs and/or fees have been remitted to [NAL] and/or [NAL]'s designee.

[Doc. 114-1 at 15 § 2.3(d); Doc. 96 at ¶ 14; Doc. 106 at ¶ 14].

15.     Section 2.3(d) of the SEA also contained an acknowledgement by NAL of receipt of $525,000 in connection with the LOI.  [Doc. 114-1 at 15 § 2.3(d); Doc. 96 at ¶ 15; Doc. 106 at ¶ 15].

16.      Specifically, NAL acknowledged receipt of $135,000 paid upon the signing

of the LOI; $175,000 paid on October 17, 2017; and $215,000 paid on October 26, 2017.

[Doc. 114-1 at 15 § 2.3(d); Doc. 96 at ¶ 15; Doc. 106 at ¶ 15].

17.      Pursuant to the SEA, NAL received payments owed under the LOI of

$225,000 for the Project Flowchart and $125,000 for the Final Report on March 12, 2018,

in the form of a payment for $100,000 and a payment for $250,000.  [Doc. 96-2 at ¶ 5;

Doc. 114-1 at 15 § 2.3(d); Doc. 96 at ¶ 16; Doc. 106 at ¶ 16].

18.      Since the signing of the BeiSur Agreement, between April 4 and September

26, 2017, NAL accrued legal fees of $161,160 for work performed by the Buchalter Law

Firm ("Buchalter").  NAL paid these legal fees to Buchalter between April 2017 and March

2018.  [Doc. 96-2 at ¶¶ 6–7]; *see also generally* [*id.* at 9–48 (Exhibits 3 through 6 to Ms.

Borgese's first declaration); Doc. 96 at ¶ 17; Doc. 106 at ¶ 17].[6]

19.      Between April 5 and May 24, 2018, Ms. Borgese incurred $4,292.50 in

charges from the law firm Astrov PC ("Astrov") in connection with consultation Ms.

Borgese received regarding the tax implications of the SEA.  Ms. Borgese paid at least

$4,000.00 toward those charges.   [Doc. 96-2 at ¶ 8; *id.* at 49–52 (Exhibit 7 to Ms.

Borgese's first declaration)]; Doc. 96-8 at 9; Doc. 96 at ¶ 18; Doc. 106 at ¶ 18].[7]

---

[6] The Parties dispute whether these fees were accrued in conjunction with the BeiSur
Agreement and negotiation of the LOI and the SEA.  [Doc. 96 at ¶ 17; Doc. 106 at ¶ 17].
IBAT argues that Buchalter's work covered a variety of topics wholly unrelated to BeiSur
and the SEA, including work related to Columbia Oil.  [Doc. 96-8 at 14].  IBAT also asserts
that only $26,702.50 of the $161,000 in fees Plaintiffs incurred was not reimbursed by the
SEA.  [Doc. 106-8 at 2].

[7] IBAT disputes whether these charges are a "direct cost[] paid by [NAL]."  [Doc. 106 at
¶ 18; Doc. 96-8 at 9].

20.     Between September 30, 2017, and February 16, 2019, NAL incurred and paid $3,000 in accounting fees from the firm Strand Boyce O'Shaughnessy, CPAs, Inc. ("Strand Boyce") in connection with consulting services for NAL pertaining to the SEA. [Doc. 96-2 at ¶ 9; id. at 53–59 (Exhibit 8 to Ms. Borgese's first declaration)]; Doc. 96 at ¶ 19; Doc. 106 at ¶ 19].[8]

21.     In February 2018, Marc Privitera incurred and paid $6,714.00 in attorney's fees with the Law Office of Garson C. Soe, a tax law firm ("Garson Soe"), in connection with legal advice pertaining to the SEA.  [Doc. 96-7 at ¶ 2; id. at 6–10 (Exhibit 1 to Mr. Privitera's first declaration)]; Doc. 96-8 at 36; Doc. 96 at ¶ 20; Doc. 106 at ¶ 20].[9]

22.     Ms. Borgese made a request for payment of these fees pursuant to the SEA on behalf of NAL on or about April 24, 2018.  [Doc. 96-2 at ¶ 10; Doc. 97 at 70:15–71:1; Doc. 96-9; Doc. 96 at ¶ 21; Doc. 106 at ¶ 21].[10]

23.     By email on June 18, 2018, IBAT rejected Ms. Borgese's requests for payment for fees paid to Buchalter.  [Doc. 96-11 at 1; Doc. 96 at ¶ 22; Doc. 106 at ¶ 22].

24.     IBAT claimed that the fees paid to Buchalter were a "billing for expenses already recouped by NAL as part of the $875,000 paid to NAL by IBAT pursuant to Section 2.3(a), (b) and (c) of the SEA and Section 1.3(d)(i) through (v) of the Letter of Intent

---

[8] IBAT disputes that these "expenses related to unspecific research directed by Christina Borgese" constitute "a direct cost[] paid by [NAL] for services."  [Doc. 96-2 at 56; Doc. 106-5 at 15 § 2.3; Doc. 106 at ¶ 19].

[9] IBAT does not dispute that the invoice reflects expenses related to Mr. Privitera and non-party Mary Privitera, but disputes that the charges constitute a "direct cost[] paid by [NAL] for services."  [Doc. 106 at ¶ 20; Doc. 96-8 at 36].

[10] IBAT disputes Plaintiffs' assertion that Ms. Borgese "sent John Ashburn requested follow-up documentation on or about May 23, 2018," [Doc. 96 at ¶ 21], but IBAT does not dispute that Ms. Borgese requested payment on or about April 24, 2018, compare [id.], with [Doc. 106 at ¶ 21].

between NAL and IBAT, dated September 28, 2017."  [Doc. 96-11 at 1; Doc. 96 at ¶ 22; Doc. 106 at ¶ 22].

25.    IBAT also stated that fees paid to Garson C. Soe, Astrov, and Strand Boyce were categories of expenses that would be "potentially reimbursable" either to NAL, or to Ms. Borgese or Mr. Privitera directly, as long as evidence of payment of the invoices were provided.  [Doc. 96-11 at 1; Doc. 97 at 122:9–124:5; Doc. 96 at ¶ 23; Doc. 106 at ¶ 23].

26.    By email on July 19, 2018, Ms. Borgese responded to IBAT's correspondence, writing that "[s]ections 2.3 (a), (b) and (c) [of the SEA] clearly state that the payments totaling $875,000 were for specific named deliverables in the reference sections that NAL delivered to IBAT.  The matter at hand is for payments for amounts detailed in Section 2.3 (d)."  [Doc. 97 at 155:19–156:12; Doc. 96-12 at 4; Doc. 96 at ¶ 24; Doc. 106 at ¶ 24].

27.    IBAT has not reimbursed NAL, Ms. Borgese, or Mr. Privitera for the above expenses for Buchalter, Garson Soe, Astrov, and Strand Boyce.  [Doc. 96-2 at ¶ 11; Doc. 96-7 at ¶ 3; Doc. 96 at ¶ 25; Doc. 106 at ¶ 25].[11]

28.    If NAL is reimbursed for the Garson Soe and Astrov fees, NAL's Board will vote to require NAL to remit those amounts to Ms. Borgese and Mr. Privitera.  [Doc. 96-13 at 85:1–12; Doc. 115-3 at ¶ 2; Doc. 96 at ¶ 26].

iv.  Appointment-Related Claims

29.    Section 3.2 of the SEA says:

Effective as of the Closing and subject to prior Exchange approval, if prior Exchange approval is required, the directors and officers of the Resulting

---

[11] IBAT does not dispute that it has not reimbursed Plaintiffs for these expenses. *Compare* [Doc. 96 at ¶ 25], *with* [Doc. 106 at ¶ 25].

14

Issuer will consist of five members, three of whom are members of IBAT's current board of directors and two of whom will be appointed by [NAL].

[Doc. 98-11 at 4 § 3.2(a); Doc. 96 at ¶ 55; Doc. 106 at ¶ 55].

30.    The SEA provides for a list of IBAT's Board members, including Ms. Borgese, at the time of closing.  [Doc. 98-11 at 4 § 3.2(a); Doc. 98 at ¶ 27; Doc. 104 at 4 ¶ 27].

31.    Ms. Borgese was added to IBAT's Board as of the closing.  [Doc. 1 at ¶ 68; Doc. 98 at ¶ 28; Doc. 104 at 4 ¶ 28].

32.    Section 3.2(b) of the SEA, as amended, also states that, within 90 days of the closing, either Paul Pedersen or David Scott would resign from the IBAT Board of Directors and Mr. Privitera would subsequently be added to the Board.  [Doc. 98-11 at 19 § 3.2(b); Doc. 114-1 at 18 § 3.2(b); Doc. 96 at ¶ 56; Doc. 106 at ¶ 56].

33.    Plaintiffs withdrew Mr. Privitera's Board candidacy on July 11, 2018, and NAL did not exercise its alleged right to appoint IBAT Board members.  [Doc. 98-12 at 2; Doc. 98 at ¶ 30; Doc. 104 at 4 ¶ 30].[12]

34.    Section 3.2(c) of the SEA provided that, if the size of the IBAT Board of Directors were to increase to more than five members, NAL would gain the right to nominate directors "such that the total number of directors of [IBAT] nominated by [NAL] will be not less than 51% of the board of directors of [IBAT]."  [Doc. 98-11 at 19 § 3.2(c); Doc. 114-1 at 18 § 3.2(c); Doc. 98 at ¶ 31; Doc. 104 at ¶ 31; Doc. 96 at ¶ 57; Doc. 106 at ¶ 57].

35.    IBAT's Board has five members and has not changed in size.  [Doc. 98 at

---

[12] Plaintiffs insist that Mr. Privitera's waiver was only through "August of 2018" and "expressly reserve[d] all rights."  [Doc. 104 at ¶ 30].

¶ 32; Doc. 104 at 5 ¶ 32; Doc. 98-1 at ¶ 6].

36.     Section 3.4 of the SEA provides:

Effective as of the Closing and subject to prior Exchange approval, if prior Exchange approval is required, the Resulting Issuer will create the following positions, or their equivalents, within the Resulting Issuer:

(a)  Executive Vice President of Engineering and Operations

(b)  Executive Vice President of Research and Development

the SA Lithium Shareholders will have the sole right to nominate the individuals to fill the above-identified positions.  Such positions may be filled by direct employees of the Resulting Issuer, contractors of the Resulting Issuer, and/or through or by any other employment agreement between the nominated individuals and the Resulting Issuer.  Acceptance of the nominations by IBAT and/or the Resulting Issuer shall not be unreasonably withheld.

[Doc. 98-11 at 19 § 3.4; Doc. 98 at ¶ 33; Doc. 104 at 5 ¶ 33].

37.     Ms. Borgese and Mr. Privitera served in the roles of Executive Vice President of Engineering and Operations and Executive Vice President of Research and Development, respectively, prior to their termination.  [Doc. 98-4 at 2; Doc. 98-5 at 2; Doc. 98 at ¶ 34; Doc. 104 at 5 ¶ 34].

38.     The SA Lithium Shareholders did not exercise their alleged right to appoint anyone following the termination.  [Doc. 98-1 at ¶¶ 4–5; Doc. 98-13 at 349:15–24; Doc. 98 at ¶ 34].[13]

        v.  Claim for Attorney's Fees

39.     The SEA does not expressly state that either Party is entitled to recover

---

[13] The Individual Plaintiffs dispute that they "were given an opportunity to appoint individuals to these roles following their termination," [Doc. 104 at 5 ¶ 34 (citing [*id.* at 12 ¶ 23]); *id.* at 12 ¶ 23 (citing [Doc. 104-2 at ¶ 18; Doc. 104-4 at ¶ 8])], because "IBAT never notified [the Individual Plaintiffs] of the availability of additional opportunities to nominate . . . executive vice presidents," [Doc. 104-2 at ¶ 18; Doc. 104-4 at ¶ 9].  IBAT asserts that it was not required to "notify" the Individual Plaintiffs.  [Doc. 116 at 10 ¶ 23].

their attorney's fees in the event of litigation.  *See generally* [Doc. 98-11]; *see also* [Doc. 98 at ¶ 35; Doc. 104 at 5 ¶ 35].

40.     Section 6 of the SEA ("Transaction Expenses") states that IBAT will bear the reasonable expenses borne by NAL, Ms. Borgese, and Mr. Privitera in "negotiating and preparing the [SEA] and in Closing and carrying out the transactions contemplated by [it]."  [Doc. 98-11 at 24 § 6; Doc. 98 at ¶ 36; Doc. 104 at 5 ¶ 36].

### vi.  Royalty Payments and Notices

41.     IBAT and NAL entered into a Royalty Agreement in connection with the SEA ("Royalty Agreement").  [Doc. 114-1 at 45–49; Doc. 96 at ¶ 28; Doc. 106 at ¶ 28].

42.     Pursuant to Section 2 of the Royalty Agreement, IBAT "agree[d] to pay, on a fiscal quarterly basis, an amount equal to five percent (5%) of the Product Income in each fiscal quarter to [NAL] (the 'Royalty Payment')."  [Doc. 114-1 at 46 § 2; Doc. 96 at ¶ 29].[14]

43.     It also provides that "if there are no Product Income [sic] in a given fiscal quarter no Royalty Payment shall be made in respect of that fiscal quarter."  [Doc. 114-1 at 46 § 2; Doc. 106 at ¶¶ 29, 30].

44.     Section 3 of the Royalty Agreement provides the following:

> [IBAT] shall deliver to [NAL] within thirty (30) days of each fiscal quarter end of [IBAT] the audited financial statements of the Company (the "Financial Statements") together with a notice setting out the amount of the Royalty Payment owing for such fiscal quarter, as well as the Conversion Price (the "Royalty Notice").  On an annual basis, [IBAT] shall deliver to [NAL] within one hundred and twenty (120) days the audited annual Financial Statements together with a notice setting out the Amount of the Royalty Payments made for the prior fiscal year (the "Annual Royalty Notice").

---

[14] IBAT asserts that Section 2 of the Royalty Agreement provides for Royalty Payments "only if IBAT sold certain products."  [Doc. 106 at ¶ 29].

[Doc. 114-1 at 46 § 3; Doc. 96 at ¶ 30].[15]

45.     NAL has never received a quarterly Royalty Notice or Annual Royalty Notice from IBAT.  [Doc. 96-2 at ¶ 12; Doc. 96 at ¶ 31].[16]

**C.     The Executive Employment Agreements**

46.     In connection with the SEA, Ms. Borgese, Mr. Privitera, and Mr. Burba each executed an EEA with IBAT on April 12, 2018.  [Doc. 95-2; Doc. 95-3; Doc. 95-4; Doc. 96 at ¶ 32; Doc. 106 at ¶ 32].

47.     Pursuant to their respective EEAs, Ms. Borgese became Executive Vice President of Research and Development and Mr. Privitera became Executive Vice President of Engineering and Operations.  [Doc. 95-2 at 1; Doc. 95-3 at 1; Doc. 96 at ¶ 32; Doc. 106 at ¶ 32].

48.     The IBAT Board of Directors unanimously ratified Ms. Borgese's and Mr. Privitera's EEAs on April 13, 2018.  [Doc. 96-2 at ¶ 13; Doc. 96 at ¶ 33; Doc. 106 at ¶ 33].

     i.   Competitive Conduct

49.     Section 7 of Ms. Borgese's, Mr. Privitera's, and Mr. Burba's EEAs governed their obligations concerning "Competitive Conduct."  [Doc. 95-2 at 6–8 § 7; Doc. 95-3 at 6–8 § 7; Doc. 95-4 at 6–8 § 7; Doc. 96 at ¶ 34; Doc. 106 at ¶ 34].

---

[15] In its attempt to dispute Plaintiffs' assertion that Section 3 of the Royalty Agreement "requires IBAT to provide quarterly and annual royalty notices . . . setting out the amount of royalty payment owed for each fiscal quarter, as well as notices setting out the amount of royalty payments for the prior fiscal year," [Doc. 96 at ¶ 30 (citing [Doc. 114-1 at 47 § 3])], IBAT merely agrees that "quarterly and annual royalty notices of 'Royalty Payments' should be made," and states that "if there are no products sold, then there are no Royalty Payments," [Doc. 106 at ¶ 30 (citing Section 2 of the Royalty Agreement)].

[16] IBAT's citation to its published annual financial statements does not create a dispute of fact with respect to whether it provided Royalty Notices or Annual Royalty Notices to NAL. *Compare* [Doc. 96 at ¶ 31], *with* [Doc. 106 at ¶ 31].

50.     Section 7 of Ms. Borgese's and Mr. Privitera's EEAs defined "Competitive Conduct" to exclude

> [a]ny work done through PreProcess, Inc. related to projects and development of Executive's Intellectual Property; [a]ny work done through PreProcess, Inc., and/or North American Lithium, Inc., that is related to extraction technology being performed on geothermal sources in the Imperial Valley of California,

and to also exclude conduct described in Exhibit B to each of the EEAs ("Carveout Provisions").  [Doc. 95-2 at 8 § 7(g); Doc. 95-3 at 8 § 7(g); Doc. 96 at ¶ 35; Doc. 106 at ¶ 35].[17]

51.     The Carveout Provisions in Exhibit B to Ms. Borgese's and Mr. Privitera's EEAs listed, among other items, "PreProcess, Inc." and "PreProcess' various subsidiaries, partnerships, and other business relationships current, planned and developing."  [Doc. 95-2 at 15; Doc. 95-3 at 15; Doc. 96 at ¶ 36; Doc. 106 at ¶ 36].

52.     The Carveout Provisions in Exhibit B to Ms. Borgese's, Mr. Privitera's, and Mr. Burba's EEAs also listed "North American Lithium" and "North American Lithium's various subsidiaries, partnerships, and other business relationships current, planned, and developing."  [Doc. 95-2 at 15; Doc. 95-3 at 15; Doc. 95-4 at 15; Doc. 96 at ¶ 37].[18]

    ii.   <u>Termination of Employment</u>

53.     IBAT terminated Ms. Borgese's and Mr. Privitera's employment on June 29, 2018.  [Doc. 95-5 at 1; Doc. 95-6 at 1; Doc. 96 at ¶ 47; Doc. 106 at ¶ 47].

---

[17] PreProcess, Inc. is a consulting, research, and development company structured as a corporation and owned by Mr. Privitera and Ms. Borgese as equal shareholders.  *See* [UMF at ¶¶ 65–66].

[18] IBAT does not dispute that Exhibit B of the EEAs contains the language quoted by Plaintiffs, *see* [Doc. 96 at ¶¶ 36–37], but "den[ies] that this section included IBAT's opportunity to work with SSI," [Doc. 106 at ¶¶ 36–37].

54.     IBAT stated that it terminated Ms. Borgese's and Mr. Privitera's employment "for Cause" pursuant to Section 5 of the EEAs and sent letters identifying the causes for their terminations.  [Doc. 98-2; Doc. 98-3; Doc. 98 at ¶ 3; Doc. 104 at 2 ¶ 3].

55.     Pursuant to Section 5 of the EEAs, "[w]hether Cause exists to justify termination of [Ms. Borgese and Mr. Privitera] shall be determined by the Employer in its sole discretion."  [Doc. 98-4 at 4 § 5; Doc. 98-5 at 4 § 5; Doc. 98 at ¶ 4; Doc. 104 at 2 ¶ 4].

56.     Plaintiffs assert that they were terminated without cause and are entitled to additional compensation as a result of a change in IBAT's control.  [Doc. 1 at ¶ 20; *id.* at 31; Doc. 98 at ¶ 5; Doc. 104 at 2 ¶ 5].

57.     Both EEAs provide additional compensation due for a "without cause" termination.  [Doc. 98-4 at 5 § 5(c); Doc. 98-5 at 5 § 5(c); Doc. 98 at ¶ 6; Doc. 104 at 2 ¶ 6].

58.     Ms. Borgese and Mr. Privitera each assert that they are owed $39,846.24 in unpaid wages.  [Doc. 98-7 at 6–7; Doc. 98 at ¶ 9; Doc. 104 at 3 ¶ 9].

59.     On or around August 4, 2018, Ms. Borgese and Mr. Privitera were paid $42,035.84 and $38,964.50, respectively.  [Doc. 97-7 at 7–8 ¶¶ 8(a), 9(a); Doc. 98-8 at 2; Doc. 98 at ¶ 10; Doc. 104 at 3 ¶ 10].

60.     The transmittal letter for this payment indicated that it included Ms. Borgese's and Mr. Privitera's compensation for both their base salaries and their accrued benefits.  [Doc. 97-7 at 7–8 ¶¶ 8(a), 9(a); Doc. 98-8 at 2; Doc. 98 at ¶ 11; Doc. 104 at 3 ¶ 11].

61.     Ms. Borgese and Mr. Privitera claim that they were denied an opportunity to participate in "employee bonus plans and long-term equity or cash incentive compensation plans."  [Doc. 1 at ¶¶ 187(e), 193(e); Doc. 98 at ¶ 12; Doc. 104 at 3 ¶ 12].

62.     Section 3(c) of the EEAs provides that:

> The Executive shall be eligible for such bonus plans and long-term equity or cash incentive compensation plans for the Employer's officers and directors as the Board may establish from time to time, which will be based on the achievement and satisfaction of goals and objectives established by the Board.

[Doc. 98-4 at 3 § 3(c); Doc. 98-5 at 3 § 3(c); Doc. 98 at ¶ 13; Doc. 104 at 3 ¶ 13].

63.     The Board did not establish bonus, long-term equity, or cash incentive compensation for Mr. Privitera or Ms. Borgese prior to their termination.  [Doc. 98-9 at 137:1–21, 139:5–17; Doc. 98 at ¶ 14; Doc. 104 at 3 ¶ 14].

**D.     The SSI Opportunities**

64.     IBAT asserts two counterclaims for usurpation of corporate opportunity and tortious interference with prospective contractual relations against Ms. Borgese and Mr. Privitera for continuing to cultivate an opportunity with SSI on behalf of NAL while employed with IBAT.  [Doc. 28 at ¶¶ 27–41].

65.     Ms. Borgese and Mr. Privitera pursued an opportunity with SSI through PreProcess, Inc. ("PreProcess"), a corporation which Mr. Privitera and Ms. Borgese owned as equal shareholders.  [Doc. 96 at ¶ 3; Doc. 106 at ¶ 3].

66.     PreProcess is a consulting, research, and development company.  [Doc. 96-3 at 15:22–16:10; Doc. 96 at ¶ 4; Doc. 106 at ¶ 4].

67.     PreProcess entered into a consulting services agreement with SSI on September 7, 2017.  [Doc. 68 at 1; Doc. 106 at ¶ 5].

68.     On May 7, 2018, Mr. Burba notified Ms. Borgese that he had been contacted by SSI on May 4, 2018.  [Doc. 96-2 at ¶ 15; Doc. 96 at ¶ 41; Doc. 106 at ¶ 41].

69.     On May 11, 2018, Mr. Burba informed both Ms. Borgese and Mr. Privitera that he had been contacted by SSI on May 4, 2018.  [Doc. 96-1 at 264:23–265:1; Doc. 96-14].

70.     In a May 11, 2018 email to Ms. Borgese, Mr. Burba summarized the discussion between Ms. Borgese, Mr. Burba, and Mr. Privitera regarding the contact Mr. Burba had received from SSI:  "Since this project was listed as a 'Carveout' during our NAL-IBAT negotiation, we need to decide how we would like to pursue this project. Do we do this through IBAT or do we follow a process that would allow NAL to pursue this separately.  I was not able to describe what this process would entail." [Doc. 96-14 at 2; Doc. 96 at ¶ 42; Doc. 106 at ¶ 42].

71.     SSI did not form a new contract with NAL or PreProcess in connection with any contact Ms. Borgese or Mr. Privitera had with SSI in 2018.  [Doc. 96-2 at ¶ 16; Doc. 96-7 at ¶ 5; Doc. 96 at ¶ 53; Doc. 106 at ¶ 53].

72.     Neither NAL, PreProcess, Ms. Borgese, nor Mr. Privitera has performed any work for compensation with SSI since Ms. Borgese and Mr. Privitera were initially hired by IBAT.  [Doc. 96-2 at ¶ 16; Doc. 96-7 at ¶ 5; Doc. 96 at ¶ 54; Doc. 106 at ¶ 54].

### III.    IBAT's Motion for Summary Judgment

IBAT seeks summary judgment with respect to certain theories asserted by the Individual Plaintiffs arising out of the EEAs (Claims 1 and 2) and certain theories asserted by NAL and the Individual Plaintiffs arising out of the SEA between Plaintiffs and IBAT (Claims 3 and 4, respectively).  [Doc. 98 at 6–7].  Because Plaintiffs' Motion for Leave to

File Sur-Reply relates to the Parties' briefing on IBAT's Motion for Summary Judgment, the Court considers it first before turning to the Parties' substantive arguments.

### A.      Plaintiffs' Motion for Leave to File Sur-Reply

Plaintiffs seek leave to file a sur-reply in response to allegedly new arguments raised in IBAT's Reply in support of its Motion for Summary Judgment.   [Doc. 117]. Neither the Federal Rules of Civil Procedure nor this District's Local Rules of Civil Practice allow for sur-replies as a matter of right.   In the Tenth Circuit, "[a] district court must permit a surreply where it relies on new materials—i.e., new evidence or new legal argument— raised in a reply brief."   *United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, No. 06-cv-00037-PAB-CBS, 2010 WL 420046, at *10 (D. Colo. Feb. 1, 2010) (citing *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006)).   "However, where the materials are not new or a court disregards any materials that are, that court need not permit a surreply." *Id.* (citing *Green v. New Mexico*, 420 F.3d 1189, 1196–97 (10th Cir. 2005)).

Here, Plaintiffs seek leave to address IBAT's argument that, "under California law, where a contract provides an employer with discretion to terminate an employee for cause, that decision is not subject to the implied covenant of good faith and fair dealing." [Doc. 117 at 2–3].  IBAT opposes on grounds that no exceptional circumstances exist and because Plaintiffs seek leave to re-argue an argument already addressed in their Response.   [Doc. 120 at 2].   The Court respectfully agrees with Defendant.   Plaintiffs' assertion that IBAT is asserting "new legal arguments" warranting a sur-reply is particularly unpersuasive given that *Plaintiffs* argued in their Response that, "[u]nder California law, the obligation of good faith and fair dealing tempers IBAT's discretion to

terminate Borgese and Privitera for 'cause.'"  [Doc. 104 at 15–16].  IBAT cited California case law in its Reply merely to counter the arguments that Plaintiffs raised in their Response.

Accordingly, in its discretion, the Court denies the Motion for Leave to File Sur-Reply.  *See U.S. ex rel. Thomas v. Black & Veatch Special Projects Corp.*, No. 2:11-cv-02475-DDC-JPO, 2015 WL 3570661, at *5–7 (D. Kan. June 5, 2015) (denying motion for sur-reply where reply presented cases and legal argument relevant to the arguments contained in the defendant's opposition), *aff'd*, 820 F.3d 1162 (10th Cir. 2016).

B.    **Analysis**

1.    **Individual Plaintiffs' Breach of EEA Claims (Claims 1 and 2)**

IBAT seeks summary judgment with respect to various claims asserted under the EEAs between the Individual Plaintiffs and IBAT.  Specifically, IBAT moves for summary judgment in its favor on all of the Individual Plaintiffs' EEA claims, except for Claims 1(f) and 2(f) for breach of its obligations under Section 2(b) of the EEAs.  [Doc. 98 at 6–7]. Under Colorado law, the elements for a breach of contract claim are:  (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) a failure to perform the contract by the defendants; and (4) damages to the plaintiff.  *W. Distrib. Co. v. Diodosia*, 841 P.2d 1053, 1058 (Colo. 1992).[19]

---

[19] As previously observed in this action, to state a breach of contract claim under California law, a plaintiff must plausibly allege facts to establish the following four elements:  "(1) existence of a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages as a result of the breach." *Borgese v. Burba*, No. 21-cv-01134-RMR-KLM, 2022 WL 3597162, at *5 (D. Colo. June 2, 2022) (quoting *Shue v. Optimer Pharms., Inc.*, No. 3:16-cv-02566-BEN-JLB, 2018 WL 1116567, at *2 (S.D. Cal. Feb. 27, 2018)).

### a.    Termination for Cause

IBAT argues that the Individual Plaintiffs lack any legal basis to challenge that their terminations were "for Cause" because their respective EEAs unambiguously state that IBAT has the sole discretion to determine "Cause."  [Doc. 98 at 7 ¶ 4, 13].  The Individual Plaintiffs admit that their EEAs provide that "[w]hether Cause exists to justify termination of [Borgese and Privitera] shall be determined by Employer in its sole discretion," *see* [Doc. 98-4 at 4 § 5; Doc. 98-5 at 4 § 5]; *see also* [Doc. 104 at 2 ¶ 4], and do not argue that Defendant has misinterpreted the meaning of that contractual statement, *see* [Doc. 104 at 15–16].  Instead, they argue that California law governs the EEAs and, under California law, the covenant of good faith and fair dealing applies to IBAT's discretion under the EEAs and IBAT breached the respective EEAs by exercising its discretion in bad faith.  [*Id.* at 15–18].

*Governing Law.*  The Individual Plaintiffs assert that California law governs the EEAs pursuant to Section 24, which provides that the "Executive shall be protected under the Employment Law of the state(s) in which he/she resides and in the event of conflict the prevailing state laws will be those that benefit the Executive."  [Doc. 104 at 15]; *see also* [Doc. 95-2 at 11 § 24].  Generally, as a federal court is sitting in diversity jurisdiction, the conflict of law rules of the forum state apply.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498 (1941); *Sec. Serv. Fed. Credit Union v. First Am. Mortg. Funding, LLC*, 861 F. Supp. 2d 1256, 1267 (D. Colo. 2012).  For contract claims, Colorado has adopted the "most significant relationship" approach set forth in the Restatement (Second) of Conflicts of Law ("the Restatement").  *See Wood Bros. Homes v. Walker Adj. Bureau*, 601 P.2d 1369, 1372 (Colo. 1979).  However, "[w]hen more than one state's law may be

applicable to a claim or issue, a court need not choose which body of law to apply unless there is an outcome determinative conflict between the potentially applicable bodies of law."  *Bowers v. Buckeye State Mut. Ins. Co.*, No. 18-cv-00496-CMA-NRN, 2019 WL 141703 (D. Colo. Jan. 9, 2019).

As an initial matter, neither side discusses the interpretation of the contractual term, i.e., what constitutes "the Employment Law of the state(s)."  *See* [Doc. 98 at 13–14; Doc. 104 at 16–17; Doc. 116 at 10–12].  Furthermore, both sides are unclear as to which state's law they are applying, given their respective invocations of both California and Colorado law—as well as other state law—throughout their papers.  *See generally* [Doc. 98; Doc. 104; Doc. 116].  Thus, the Court considers whether the covenant of good faith and fair dealing tempers IBAT's discretion under either California or Colorado law.

**Bad Faith Termination for Cause.**  Ms. Borgese and Mr. Privitera were California residents for the entirety of their tenures at IBAT.  [Doc. 104-2 at ¶ 10; Doc. 104-4 at ¶ 2]. The Individual Plaintiffs argue that IBAT exercised its discretion to terminate Ms. Borgese and Mr. Privitera "for Cause" in bad faith in violation of California law, citing two California Supreme Court cases for the proposition that IBAT's implied duty of good faith and fair dealing tempered its discretion to terminate the Individual Plaintiffs for "cause."  [Doc. 104 at 15–16 (citing *Foley v. Interactive Data Corp.*, 765 P.2d 373, 389 (Cal. 1988); *Cotran v. Rollings Hudig Hall Int'l, Inc.*, 948 P.2d 412, 422 (Cal. 1998))].

Under California law, the implied covenant of good faith and fair dealing is implicitly incorporated by law into every contract.  *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 2 P.3d 1, 8 (Cal. 2000).  But the implied covenant does not exist as to subjects already completely covered by a contract.  *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798,

804 (Cal. Ct. App. 1995).  When a contract expressly forbids or permits conduct, no implied covenant can contradict the contract's terms. *Carma Devs. (Cal), Inc. v. Marathon Dev. Calif., Inc.*, 826 P.2d 710, 728 (Cal. 1992).  The Individual Plaintiffs' reliance on *Foley* and *Cotran* is misplaced because—unlike the circumstances presented here—the employers in both cases had limited discretion under implied contracts; the employers were obligated to terminate employees only for "good cause."  *Foley*, 765 P.2d at 380; *Cotran*, 948 P.2d at 414.   Under California law, if an employer has the contractual right to terminate the employment relationship as it chooses, then its decision to do so cannot give rise to a good faith claim—even if its decision is allegedly made in bad faith*. See, e.g.*, *Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089, 1100–01, 1110 (Cal. 2000).

In *Guz*, the California Supreme Court rejected the argument "that the implied covenant can impose substantive terms and conditions beyond those to which the contract parties actually agreed," because "such a theory directly contradicts [the California Supreme Court's] conclusions in *Foley*."  *Id.* at 1110.  Thus, parties cannot rely on the covenant of good faith and fair dealing to "impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."  *Id.*  In other words, "if the employer's termination decisions, however arbitrary, do not breach such a substantive contract provision, they are not precluded by the covenant."  *Id.*

In its Reply, IBAT argues that Plaintiffs admit that IBAT had sole discretion to determine that the Individual Plaintiffs' terminations were for "Cause," and under Colorado law, if there is no duty, there can be no breach of contract.  [Doc. 116 at 10–11 & n.2].  IBAT further cites California legal authority in support of its arguments, *see, e.g.*, [*id.* at

11 (applying California law)], including *Walter v. Adaptive Insights, Inc.*, No. 5:18-cv-06767-NC, 2019 WL 13201942, at *2 (N.D. Cal. July 10, 2019).  This Court finds *Walter* persuasive.  In *Walter*, after dismissing the plaintiff's breach of contract claim because the "contract's own terms govern and its terms gave [the employer] sole discretion to determine whether [the plaintiff's] termination was 'for cause,'" 2019 WL 13201942, at *1, the court denied as futile the plaintiff's motion for leave to amend his complaint to add a claim for breach of the covenant of good faith and fair dealing, *id.* at *2–3.  California law did not allow a party to "imply a covenant of good faith and fair dealing that contradicts the express terms" of the employment agreement.  *Id.* at *2.  There can be no breach of the covenant "when the contract expressly permits a party to act 'in its sole discretion[ ]' and the party does so."  *Id.* at *2 (quoting *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 886 (N.D. Cal. 2015)).

Here, under the express language of Section 5(a) of the EEAs, IBAT had the sole discretion to determine whether "Cause," defined to include "the Executive's failure or refusal to perform the services required or as requested by the Board or the Chief Executive Officer," exists to justify termination.  [Doc. 98-4 at 4 § 5; Doc. 98-5 at 4 § 5].  Because the EEAs explicitly provided IBAT with sole discretion to determine whether "Cause" exists, the Individual Plaintiffs cannot prevail on claims premised on IBAT's exercise of that discretion.  *See Openshaw v. FedEx Ground Package Sys., Inc.*, 576 F. App'x 685, 687 (9th Cir. 2014) ("Because the Agreement explicitly gave [the defendant] discretion over whether or when to act, [the defendant] did not breach its covenant of good faith and fair dealing by exercising that discretion."); *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 779 (9th Cir. 2003) (applying California law and affirming

summary judgment for defendant that "terminated an at-will relationship according to an express contract provision" and "did not violate any substantive contract provision by terminating the [plaintiffs]" because plaintiffs "cannot graft a good cause requirement onto the Termination Provision using the implied covenant of good faith and fair dealing"); *Song fi Inc.*, 108 F. Supp. 3d at 885 ("Plaintiffs cannot state a claim for breach of the implied covenant of good faith and fair dealing, because 'if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.'" (quoting *Carma*, 826 P.2d at 728)).

Next, the Court considers whether the covenant applies under Colorado law. While Plaintiffs assert in their Response that California law governs this issue, they devote a footnote to the argument that "[e]ven under Colorado law, and unlike the discretion simply to terminate, the implied covenant of good faith and fair dealing applies to an employer's discretion to terminate 'for cause.'"  [Doc. 104 at 16 n.1 (citing *Oberhamer v. Deep Rock Water Co.*, No. 06-cv-02284-JLK, 2009 WL 1193737, at *8 (D. Colo. Apr. 29, 2009))].  *Oberhamer* is the only Colorado law Plaintiffs cite with respect to this issue, and their reliance on that case is misplaced.

There, the employer "agreed in the contract to <u>limit its discretion</u> with respect to the determination of 'Cause' to a standard of reasonableness."  *Oberhamer*, 2009 WL 1193737, at *8 (emphasis added).  As a result, the court concluded that the employer's discretion to determine "Cause" under that contract was not "unfettered."  *Id.*  Then, the court considered a severance provision of the same contract, which conditioned severance pay on whether the employee was terminated with or without "Cause."  *Id.*  The court found that the severance provision permitted the implication of the covenant of good

faith and fair dealing—and, specifically, because of the reasonableness requirement that attached to the determination for "Cause" under the contract's plain language.  *Id.*

Unlike the contract at issue in *Oberhamer*, there is no requirement in the EEAs that IBAT use a "reasonableness" standard in the exercise of its sole discretion.  Instead, the plain language of the EEAs expressly reserves the determination of whether Cause exists to IBAT's sole discretion, [Doc. 98-4 at 4 § 5; Doc. 98-5 at 4 § 5], a conclusion not disputed by the Individual Plaintiffs, [Doc. 104 at 15–18].  Thus, under both California and Colorado law, the Individual Plaintiffs' claims premised on a theory of bad faith termination "for Cause" fail as a matter of law.

### b.    Change of Control

The Individual Plaintiffs also assert claims for additional compensation under either Section 5(b) or 5(c) of the EEAs on the basis that, if they were terminated without cause, they were entitled to additional compensation because they were fired within 24 months of a "change of control" of IBAT, premised on a change in IBAT's CEO.  [Doc. 98-4 at 4 § 5(b); Doc. 98-5 at 4 § 5(b)].  However, the Individual Plaintiffs' claims are foreclosed by the Court's conclusion that IBAT had sole discretion to determine whether cause existed to terminate the Individual Plaintiffs' employment "for Cause" pursuant to Section 5(a).  It is immaterial whether the Individual Plaintiffs were terminated during "the twenty-four (24) month period following a Change of Control," because the Individual Plaintiffs cannot establish that IBAT "terminate[d] the Executive[s'] employment without Cause."  *See* [UMF at ¶¶ 54–57].

### c.    Base Salary, Vacation Time, and Accrued Benefits

IBAT moves for summary judgment on the Individual Plaintiffs' claims for unpaid salary and benefits because the Individual Plaintiffs received payment for their base salaries and accrued benefits on August 4, 2018, and have not provided any evidence that they are entitled to receive any additional benefits or additional vacation pay to refute the calculation made by IBAT.  [Doc. 98 at 14–15].

The Individual Plaintiffs acknowledge receipt of payments of $42,035.84 and $38,964.50, respectively, upon their termination by IBAT.  [Doc. 104 at 22].  Still, the Individual Plaintiffs assert that disputed issues of material fact regarding the *characterization* of these payments remain.  [*Id.* at 22–23].  According to the Individual Plaintiffs, there remains a question as to whether the undisputed payments were issued as the salary payments they demanded or as severance payments.  [*Id.*].

As detailed herein, the Individual Plaintiffs were terminated for cause pursuant to Section 5(a).  Under the plain language of Section 5(a), IBAT was required to pay "the Executive's accrued salary, benefits and vacation . . . up to and including the date of termination . . . in a single lump sum within thirty (30) days of such termination."  [Doc. 98-4 at 4 § 5(a); Doc. 98-5 at 4 § 5(a)].  Thereafter, the Individual Plaintiffs and IBAT would have "no further obligations" under the EEAs.  [*Id.*].  The EEAs provide for severance payments only if the Executive is terminated under Section 5(b) or 5(c), which apply only if IBAT "terminates the Executive's employment <u>without</u> Cause."  [Doc. 98-4 at 4–6 § 5(b)–(c); Doc. 98-5 at 4–6 § 5(b)–(c) (emphasis added)].  Because IBAT exercised its sole discretion to determine that cause existed for terminating the Individual Plaintiffs' employment, the Individual Plaintiffs cannot establish that IBAT owed them severance

payments.  The Individual Plaintiffs cannot manufacture a dispute of fact by claiming that IBAT instead paid them a severance to which they were not entitled.

Moreover, a party seeking to recover for the value of accrued vacation time or benefits must provide a means of calculating its cash value.  *See, e.g.*, *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1222 (10th Cir. 2007) (upholding trial court's denial of claim for the value of vacation time because plaintiff did not present evidence or legal authority to support his claim for its alleged value).  Here, the Individual Plaintiffs do not identify any evidence to refute IBAT's calculation of the amounts due and paid to the Individual Plaintiffs, nor do they otherwise provide a means of calculating the value of the allegedly unpaid benefits.  The Individual Plaintiffs' claims for unpaid salary and benefits thus fail as a matter of law.  *See Terrones v. Tapia*, 967 P.2d 216, 219 (Colo. App. 1998) (plaintiffs had an affirmative obligation to demonstrate the existence of evidence sufficient to prove their claimed damages in response to defendant's motion for summary judgment).

        **d.**        **Employee Bonus, Long-Term Equity, or Cash Incentive Plans**

Section 5(b) of the EEAs applies only "[i]f the Employer terminates Executive's employment without Cause."  [Doc. 98-4 at 4 § 5(b); Doc. 98-5 at 4 § 5(b)].  As set forth above, IBAT exercised its sole discretion to terminate the Individual Plaintiffs' employment for cause under Section 5(a), and the Individual Plaintiffs cannot establish otherwise.  *See* [Doc. 104 at 19 ("IBAT has made no argument with respect to damages based on Sections 5(b)(i)–(iii) of the EEA except for its claim that IBAT terminated Borgese and Privitera for 'cause' in its sole discretion.")].  Thus, the Individual Plaintiffs cannot establish

their entitlement to payment pursuant to employee bonus, long-term equity, or cash incentive plans under Section 5(b) as a matter of law.

Accordingly, IBAT's Motion is granted with respect to the Individual Plaintiffs' claims for breach of Section 5 of the EEAs.

### e.    Executives' Intellectual Property

IBAT also moves for summary judgment with respect to the alleged unauthorized use of the Individual Plaintiffs' Intellectual Property based on the argument that the Individual Plaintiffs have failed to allege any damages.  [Doc. 98 at 25].  With respect to Claims 1 and 2, this argument pertains to the alleged breach of Section 2(c) of the EEA asserted under Claims 1(g) and 2(g).  [Doc. 1 at ¶¶ 187(g), 193(g)].  Under either Colorado or California law, damages are an element of breach of contract.  *See supra*.  In Colorado, proof of actual damages is not an essential element of a claim for breach of contract, *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 818 (Colo. App. 2003), whereas under California law, a breach of contract claim requires a showing of "appreciable and actual damage," *Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000) (applying California law to breach of contract claim and noting that the harm "must constitute something more than nominal damages") (quotation omitted).

Here, Ms. Borgese and Mr. Privitera do not appear to dispute Defendant's argument with respect to a lack of damages, and do not point to any evidence to the contrary.  *See generally* [Doc. 104].  Nor do they argue that they are entitled to nominal damages with respect to any unauthorized use of Executives' Intellectual Property.  [*Id.*]. In response to an interrogatory requesting that they identify and describe in detail each item of alleged damages claimed by them in this action, including the factual basis for

such damages, the Individual Plaintiffs responded:  "Borgese and Privitera also reserve the right to seek damages related to possible unauthorized use of intellectual property in industries outside of oilfield brines," but identified no damages or facts in support of *any* unauthorized use of Executives' Intellectual Property.  [Doc. 98-7 at ¶ 17].  Moreover, in responding to Paragraph 38 of Defendant's Motion for Partial Summary Judgment, the Individual Plaintiffs only deny allegations related to the denial of Ms. Borgese's and Mr. Privitera's ability to nominate individuals to Executive Vice President positions or IBAT's Board.  [Doc. 104 at 5 ¶ 38].  Rule 56(e) of the Federal Rules of Civil Procedure provides that if a party fails to properly address another party's assertion of fact as required by Rule 56(c), the Court may consider the fact undisputed for the purposes of the motion. Fed. R. Civ. P. 56(e).  Thus, the Individual Plaintiffs have not only adduced insufficient evidence of damages, but also of breach.  Failure by the Individual Plaintiffs to adduce sufficient evidence to show a material question of fact as to the unauthorized use of the Executives' Intellectual Property or damages entitles IBAT to summary judgment on these breach of contract claims.  *See Nat. Wealth Real Est., Inc. v. Cohen*, No. 05-cv-01233-LTB, 2008 WL 511761, at *5–6 (D. Colo. Feb. 21, 2008) (granting counterdefendant's motion for summary judgment on breach of contract counterclaim because counterclaimant failed to demonstrate a triable fact regarding counterdefendant's failure to perform obligations under the contract (i.e., breach) or damages caused by such failure); *Unicon Fin. Servs., Inc. v. InterCept, Inc.*, 256 F. App'x 27, 29 (9th Cir. 2007) (plaintiff failed to establish actual damages as a result of defendant's purported breach of contract, as required for summary judgment on breach of contract claim under California law).

Accordingly, this Court concludes that summary judgment should enter as to Claims 1 and 2 in favor of IBAT and against Plaintiffs Borgese and Privitera, except on the theory that IBAT breached their respective EEAs by preventing Ms. Borgese and Mr. Privitera from engaging in Outside Work as described in EEA Section 2(b), *see* [Doc. 1 at ¶¶ 187(f); 193(f)], which does not appear to be subject to Defendant's Motion for Partial Summary Judgment.  Thus, summary judgment for IBAT is granted as to Claim 1(a) through (e) and (g) and Claim 2(a) through (e) and (g).

### 2.     Plaintiffs' Breach of SEA Claims (Claims 3 and 4)

Next, IBAT seeks summary judgment with respect to various claims asserted under the SEA executed between Plaintiffs and IBAT.  Specifically, IBAT moves for summary judgment in its favor on NAL's claims under Sections 3.2 and 6 of the SEA (Claims 3(a) and (g)) and the Individual Plaintiffs' claims under Sections 2.2, 3.2, and 3.4 of the SEA (Claims 4(a) through (f)).  [Doc. 98 at 16–24].  IBAT also seeks summary judgment on the Individual Plaintiffs' "unpled" claim for lost sale opportunity to damages.  [*Id.* at 17–18].  The Parties do not dispute that Colorado law applies to the SEA.  *See* [Doc. 98-11 at 41 § 15.8]; *see also Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

### a.     Section 2.2(b)(i)–(iii) Claims

Plaintiffs' Complaint alleges that only copies, not original certificates, were issued for the Section 2.2(a) shares and that the Section 2.2(b)(i)–(iii) shares were not provided to the Individual Plaintiffs.  [Doc. 1 at ¶¶ 175–76].  IBAT argues that the Individual Plaintiffs' claims regarding shares under Section 2.2(b)(i) through (iv) of the SEA are moot

because the Individual Plaintiffs received specific performance on their share-related claims upon receipt of the shares. [Doc. 98 at 16]. According to IBAT, in the Individual Plaintiffs' own words, they requested "alternate relief" with respect to their Section 2.2(b)(i)-(iii) and Section 2.2(b)(iv) shares by demanding "*either* the issuance of shares in tradeable form," (i.e., specific performance) "*or* damages based on IBAT's failure to issue shares." [*Id.* (citing [Doc. 98-10 at 3–4])].

> In the verified Motion to Bifurcate, the Individual Plaintiffs concede that they can
>
> no longer seek damages for shares they had not received because they ha[ve now] actually received those shares [and i]t would be a double recovery to award Borgese or Privitera damages for the value of the stock they had already received.

[Doc. 86 at 7]; *see also* [Doc. 98 at ¶ 20; Doc. 104 at 4 ¶ 20]. Because the Individual Plaintiffs have received specific performance on their share-related claims and are not entitled to "double recovery," IBAT argues that the Individual Plaintiffs' claims are moot, and no further relief is available. [Doc. 98 at 16–17].

Plaintiffs do not substantively respond to IBAT's argument that the Individual Plaintiffs' *existing* claims premised on these shares are now moot, *see generally* [Doc. 104], and the Individual Plaintiffs admit that IBAT issued the shares related to patent-filing milestones under Section 2.2(b)(i)–(iii), [*id.* at 3–4 ¶¶ 18–20]; *see also* [Doc. 86 at 5, 8]. With respect to the Individual Plaintiffs' claims for specific performance or monetary damages for the value of the shares, IBAT has established that it is entitled to summary judgment in its favor as to Claim 4(b).

### b.    Opportunity to Trade IBAT Shares

Next, IBAT argues that the Individual Plaintiffs' unpled claim regarding a lost opportunity to trade IBAT shares must fail as a matter of law. [Doc. 98 at 17]. The

Complaint does not assert a claim related to IBAT's alleged efforts to prevent the shares' sale, and Plaintiffs have not moved to amend.  [Doc. 1; Doc. 86 at 10].  The Individual Plaintiffs nevertheless assert that they were damaged by IBAT's conduct with respect to preventing them from trading all their shares, including the Section 2.2(b)(i)–(iii) shares discussed above and Section 2.2(b)(iv) shares.  [Doc. 98-7 at 4].

The Parties' arguments with respect to "*potential* claims for damages" for lost sale opportunities caused by IBAT's delay in allowing the Individual Plaintiffs to trade their IBAT stock are also the subject of the Motion for Bifurcation. *See* [Doc. 104 at 19 ("IBAT is raising the same arguments regarding these issues as in its opposition to Plaintiffs' motion for bifurcation.")].  The Individual Plaintiffs "are not currently in any position to be able to demonstrate their damages" in connection with the alleged delay of the issuance of any shares, and they "readily concede that if the value of the IBAT shares increase [then the Individual Plaintiffs] will have suffered no further damages" in connection with their unpled claim.  [Doc. 86 at 9].  Given that Plaintiffs have not sought leave to file an amended complaint to include any claims for loss sale opportunity damages, the Court declines to consider the merits of any "potential" claims at summary judgment. Accordingly, IBAT's Motion for Summary Judgment as to any unpled lost sale opportunity claims under Claim 4 is **DENIED**.

### c.    Appointment/Nomination of Officers and Directors

IBAT argues that Plaintiffs' claims that IBAT breached the SEA by denying NAL's right to nominate or appoint members to IBAT's Board of Directors and the Individual Plaintiffs' right to nominate Executive Vice Presidents under Sections 3.2 and 3.4 of the SEA, respectively, fail as a matter of law.  [Doc. 98 at 18].  NAL claims that Section 3.2

provides NAL with indefinite rights to nominate 51% of IBAT's Board members.  [Doc. 104 at 20–22].  IBAT contends that this interpretation is both void as against public policy and contrary to the plain language of the SEA, and, in any event, Plaintiffs waived any such claims because they neither attempted to appoint individuals to serve as directors (NAL) nor proposed individuals to serve as Executive Vice Presidents for IBAT (the Individual Plaintiffs).  [Doc. 98 at 18–21].

***Individual Plaintiffs' Claim Under Section 3.4.***  The Individual Plaintiffs' nomination-related claim (Claim 4(f)) is asserted pursuant to Section 3.4 of the SEA.  *See* [Doc. 1 at ¶ 203(f)].  IBAT argues that it is entitled to summary judgment on this claim because it has satisfied its obligations under Section 3.4, which provides that:

> Effective as of the Closing . . . [IBAT] will create the following positions, or their equivalents, within [IBAT]:
>
> (a)  Executive Vice President of Engineering and Operations
>
> (b)  Executive Vice President of Research and Development
>
> the SA Lithium Shareholders will have the sole right to nominate the individuals to fill the above-identified positions.  Such positions may be filled by direct employees of [IBAT], contractors of [IBAT], and/or through or by any other employment agreement between the nominated individuals and [IBAT].  Acceptance of the nominations by IBAT . . . shall not be unreasonably withheld.

[UMF at ¶ 36].  The Court respectfully agrees with IBAT.

The undisputed facts establish that, effective as of the closing, IBAT created the two Executive Vice President positions, and in connection with the SEA, Ms. Borgese and Mr. Privitera—the "SA Lithium Shareholders"—executed EEAs with IBAT to fill the roles of Executive Vice President of Engineering and Operations (Section 3.4(a)), and Executive Vice President of Research and Development (Section 3.4(b)), respectively. [*Id.* at ¶¶ 46–47].  IBAT's Board unanimously ratified Ms. Borgese's and Mr. Privitera's

EEAs on April 13, 2018, [*id.* at ¶ 48], and the SA Lithium Shareholders did not exercise their alleged right to nominate anyone following the Ms. Borgese's and Mr. Privitera's terminations, [*id.* at ¶ 38]. Thus, IBAT's acceptance of the SA Lithium Shareholders' nominations have not been "unreasonably withheld," [Doc. 98-11 at 19 § 3.4], and the Individual Plaintiffs have failed to identify any triable issue of fact that would preclude summary judgment on this claim.

***NAL's Claim Under Section 3.2.*** Plaintiffs' Response conflates two separate potential rights under the SEA: (1) NAL's right to have Ms. Borgese and Mr. Privitera serve on the Board at the time of closing or within 90 days thereof under Section 3.2(a) and (b), and (2) NAL's alleged right to nominate Board members if IBAT's Board expands beyond five members under Section 3.2(c). [Doc. 104 at 20–22]. IBAT asserts that it met its obligations under both provisions, [Doc. 116 at 14–16], and the Court respectfully agrees.

Sections 3.2(a) and (c) provide that Ms. Borgese and Mr. Privitera will be Board members "as of the Closing" or 90 days thereafter. Plaintiffs do not identify any ambiguity as to these phrases. Section 3.2(a) provides that, "[e]ffective as of the Closing," IBAT's Board "will consist of five members, three of whom are members of IBAT's current board of directors and two of whom will be appointed by [NAL]." [Doc. 98-11 at 4 § 3.4]. Two NAL shareholders, Mr. Burba and Ms. Borgese, were identified among the five directors, *see* [*id.*], and there is no dispute that Ms. Borgese was an IBAT Board member "as of the Closing," [UMF at ¶ 31].

Similarly, Plaintiffs do not identify any ambiguity with respect to Section 3.2(b), pursuant to which, within 90 days following the closing, Mr. Privitera would also become a member of the Board of Directors. The SEA closed on April 12, 2018. [*Id.* at ¶ 8].

Plaintiffs do not dispute that, on July 11, 2018, NAL waived its right to appoint Mr. Privitera

to the Board "through August 2018."   [*Id.* at ¶ 33].[20]   Thus, NAL waived its right under

Section 3.2(b), which provides for Mr. Privitera's appointment to the IBAT Board "within

90 days of the Closing."

Still, Plaintiffs rely on Section 3.2(c) to assert that NAL is entitled to appoint 51%

of IBAT's Board indefinitely.  According to Plaintiffs,

> the ambiguity as to Section 3.2 (if any) involves whether NAL's right to
> nominate 51% of IBAT's board is triggered only if its board increases in size
> or whether Section 3.2 reflects the parties' intent that NAL retain the right to
> nominate 51% of IBAT's board regardless whether its size changes.

[Doc. 104 at 22].  Section 3.2(c) provides that

> In the event that the size of the board of directors of [IBAT] is increased to
> include more than five members, [NAL] will have the right to nominate
> additional directors such that the total number of directors of [IBAT]
> nominated by [NAL] will not be less than 51% of [IBAT's] board . . . .

[UMF at ¶ 34].  Pursuant to the plain terms of the SEA, the nomination rights provided by

Section 3.2(c) are triggered only "in the event that the size of the board of directors of

[IBAT] is increased to include more than five members . . . ."   [*Id.*].  Given that IBAT's

Board has not increased to more than five members, [*id.* at ¶ 35], Plaintiffs cannot

establish the condition precedent necessary for the 51% threshold in Section 3.2(c) to

apply.   Accordingly, this theory of breach of contract also fails, and IBAT is entitled to

summary judgment in its favor on Claim 3(g).

---

[20] Plaintiffs concede that NAL waived its right to nominate Mr. Privitera to the Board—but
only "through August 2018"—and assert that NAL nevertheless "expressly reserved future
rights."   [Doc. 104 at 22].  Notably, NAL waived this right exactly 90 days after closing.
*See* [UMF at ¶ 8 ("The SEA closed on April 12, 2018."); *id.* at ¶ 33 ("Plaintiffs withdrew
Mr. Privitera's board candidacy on July 11, 2018.")].

### d.      Attorney's Fees[21] Under Section 6

IBAT contends that NAL's claim to attorney's fees under Section 6 of the SEA fails as a matter of law because this litigation is not in furtherance of the execution of the SEA, [Doc. 98 at 22], and because the Court can determine that the provision is not a litigation fee-shifting clause as a matter of law, [Doc. 116 at 19].  Plaintiffs counter that another provision of the SEA uses the term "expenses" and contemplates "legal fees" (Section 2.3(d)) so, "in the context of the SEA as a whole, references to payment of expenses clearly include attorney's fees."  [Doc. 104 at 23].

Colorado courts recognize that "[n]o 'formulaic language' is required to constitute a valid fee-shifting provision, so long as the provision 'clearly informs the parties that a breach . . . may result in an award of attorney fees.'"  *Morris v. Belfor USA Grp.,* 201 P.3d 1253, 1260 (Colo. App. 2008) (alteration in original) (quoting *Butler v. Lembeck*, 182 P.3d 1185, 1189 (Colo. App. 2007)).

Here, Section 6 requires IBAT to bear "all reasonable expenses incurred by [Plaintiffs] in negotiating and preparing the Agreement and in Closing and carrying out the transactions contemplated by the Agreement."  [Doc. 98-11 at 24 § 6]; *see also* [UMF at ¶¶ 39–40].  No provision of the SEA clearly warns the parties that a breach of the SEA may lead to an award of attorney's fees.  Indeed, Plaintiffs admit that the SEA contains no language expressly referring to litigation with respect to attorney's fees.  *See* [UMF at ¶¶ 39–40; Doc. 104 at 5 ¶ 35].   While "IBAT agreed to reimburse Plaintiffs for all reasonable expenses incurred in carrying out the transactions contemplated by the SEA,"

---

[21] While the Parties have agreed to bifurcate the issue of damages arising out of Section 6 in connection with the Motion to Bifurcate, *see* [Doc. 104 at 23 n.2 (citing [Doc. 86 at 1, 11])], the Motion to Bifurcate is denied for the reasons set forth below.

[Doc. 104 at 24], IBAT did not agree to reimburse NAL for attorney's fees incurred in litigating claims for breach of IBAT's obligations under the SEA.  Accordingly, Claim 3(a) fails as a matter of law insofar as it seeks attorney's fees incurred in litigating this action under Section 6 of the SEA.

### e.     Stock Options

The Parties' arguments with respect to the Individual Plaintiffs' stock options claims under Section 2.2(b) and 3.2(a) are not particularly cogent.  The Court begins with the only allegations in Plaintiffs' Complaint regarding these stock options.

First, Plaintiffs' Complaint alleges that "IBAT did not issue Borgese and Privitera stock options to which they are entitled to participate pursuant to SEA Section 2.2.  From public information Burba has been granted at least 5,698,500 stock options."  [Doc. 1 at ¶ 180].  Then, in Claims 4(c) and (d), asserted by the Individual Plaintiffs as the "Holders of Shares Issued by SA Lithium" against IBAT, the Individual Plaintiffs identify as examples of IBAT's breaches of the SEA its failure to (1) "issue Stock Option Plan shares in violation of SEA Section 2.2., estimated to be 5,698,500 to each Borgese and Privitera," [*id.* at ¶ 203(c)], and (2) "grant additional stock option participation in violation of SEA Section 3.2(a)," [*id.* at ¶ 203(d)].  IBAT argues that the Individual Plaintiffs cannot prevail on a claim that IBAT failed to issue stock options to the Individual Plaintiffs in violation of the SEA because the issuance of stock options was an exercise of discretion reserved for IBAT's Board of Directors under IBAT's Stock Option Plan.  [Doc. 98 at 23 (citing [Doc. 98-11 at § 2.2(b); Doc. 98-18 at § 1.3])].

In Response, Plaintiffs assert that the Individual Plaintiffs' "claim for stock options are [sic] based on 1) the awards they would have presumably received had they been

permitted to serve on IBAT's Board of Directors under Section 2.2(b) of the SEA, and 2) their right to participate 'in present and/or future grants of incentive stock options' under Section 3.2(a) of the SEA."  [Doc. 104 at 24].  The Court finds several issues with Plaintiffs' arguments.

First, they do not address IBAT's position that, as *SA Lithium Shareholders*, the Individual Plaintiffs "shall be allowed to participate in the Company's Stock Option Plan when 'such shares are available.'"  *See* [Doc. 98 at 23].  Instead, the Individual Plaintiffs assert that their claim is based on an (ill-defined) entitlement to options as members of IBAT's Board of Directors.  Still, the Individual Plaintiffs fail to explain how the fact that "[d]ilution for all IBAT board members shall be at the same rate" entitles them to receive the same number of stock options issued to "similarly situated board members" in late August 2018—at a time when Ms. Borgese and Mr. Privitera were unquestionably not "IBAT board members."  [Doc. 104 at 24 (quotation omitted and alteration in original)].  Second, the Individual Plaintiffs provide no basis from which a reasonable factfinder could conclude that Section 3.2(a) of the SEA, which provides only that the Individual Plaintiffs "*may* be entitled to participate in present and/or future grants of incentive stock options of IBAT," without more, entitles Ms. Borgese and Mr. Privitera to stock options.  *Cf.* [UMF at ¶¶ 11–13].

As the Court has previously stated, it is the Individual Plaintiffs' burden to come forward with sufficient evidence to show a trial-worthy dispute of fact as to this theory under Claims 4(c) and (d).  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991).  Even construed in the light most favorable to them as the non-moving party, the Individual Plaintiffs have failed to make such a showing here.

### f.      Delivery of Original Share Certificates

IBAT argues that the Individual Plaintiffs cannot establish facts showing that IBAT failed to deliver original share certificates of the Section 2.2(a) shares.  [Doc. 98 at 24]. Ms. Borgese and Mr. Privitera assert that, although the transmittal letter sent with the shares indicates that "ORIGINAL" certificates were sent, they received only copies.  [Doc. 104 at 24–25].   Because Ms. Borgese submitted the original "copies" of the share certificates from IBAT to a third-party, Computershare Investor Services ("Computershare"), the Individual Plaintiffs never produced the original "copies" through discovery in this case, [Doc. 98 at 24 (citing [Doc. 98-17 at 212:7–213:15])], and have not subpoenaed Computershare for return of the original "copies," [*id.*].  According to IBAT, the best-evidence rule bars the Individual Plaintiffs from using copies at trial, and there is no triable issue of fact to be decided.  [*Id.* (citing *MacKinney v. Allstate Fire & Cas. Ins. Co.*, No. 16-cv-01447-NYW, 2017 WL 3397361, at *3–5, *7 (D. Colo. Aug. 8, 2017) (granting summary judgment because plaintiff failed to support his claim with admissible, non-hearsay evidence))].

"To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006); *see also Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995) ("It is well settled in this circuit that we can consider only admissible evidence in reviewing [a motion for] summary judgment.").  "This does not mean that [summary judgment] evidence must

be submitted 'in a form that would be admissible at trial.'"  *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "Parties may, for example, submit affidavits despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form."  *Argo*, 452 F.3d at 1199.  Nonetheless, "the content or substance of the evidence must be admissible."  *Id.* (quotation omitted).  "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form." *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quotation omitted); *see also* Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").

First, IBAT's reliance on *MacKinney* is misplaced.  In that case, the issue was not one of authenticity, as raised by IBAT through its best-evidence objection.  *See United States v. Parson*, No. 4:21-cr-00112-CVE, 2021 WL 4523496, at *3 (N.D. Okla. Oct. 4, 2021) (observing that the United States Court of Appeals for the Tenth Circuit notes that the fundamental purpose of the best-evidence rule is ensuring the accuracy and authenticity of an original document).  Instead, the objection raised in *MacKinney* was one of hearsay, i.e., whether the documents offered in opposition to the motion for summary judgment could be admitted for the truth of the matter asserted.  2017 WL 3397361, at *3–5.  This Court found that statements contained in a letter constituted inadmissible hearsay evidence.  *Id.* at *4.  This Court went on to observe that the plaintiff

"offer[ed] no testimony from Allstate or other admissible evidence" that reflected a necessary element of the plaintiff's claim to avoid summary judgment.  *Id.*

Here, IBAT does not mount a hearsay challenge.  In any case, the Individual Plaintiffs provide an affidavit regarding the appearance of the share certificate "copies" that IBAT originally transmitted to Ms. Borgese, *see* [Doc. 104 at 14 ¶ 31; Doc. 104-2 at ¶¶ 6–9], and assert that they may subpoena the original "copies" and transmittal documents from Computershare ahead of trial, [Doc. 104 at 25 (citing *Circle Grp., LLC v. Se. Carpenters Reg'l Council*, 836 F. Supp. 2d 1327, 1352 (N.D. Ga. 2011) ("Rule 45 subpoenas may be employed in advance of trial and outside of a discovery deadline . . . to secure for the use at trial original documents previously disclosed by discovery."))].  The evidence proffered by the Individual Plaintiffs is sufficient for purposes of avoiding summary judgment on Claim 4(a), which relates to IBAT's failure to deliver original share certificates under Section 2.2(a).

Accordingly, in this respect, IBAT's Motion for Summary Judgment as to Claim 4 is denied.

### 3.    Plaintiffs' Remaining Claims Against IBAT

Finally, IBAT argues that several of Plaintiffs' breach of contract claims under the SEA fail for lack of any injury or actual damages.  Under Colorado law, "[p]roof of actual damages is not an essential element of a breach of contract claim."  *Interbank Invs., LLC*, 77 P.3d at 818.  "Nominal damages are recoverable even if no actual damages resulted or can be proven."  *City & Cnty. Of Denver v. Bd. Of Cnty. Comm'rs of Adams Cnty.*, 543 P.3d 371, 382 (Colo. 2024).  "When a plaintiff establishes breach, but does not prove actual damages, the plaintiff is entitled to nominal damages."  *Interbank Invs., LLC*, 77

P.3d at 818.  Stated differently, Plaintiffs need not provide evidence of actual damages to survive summary judgment so long as they provide evidence establishing breach.

*Royalty Agreement.*  NAL's claim for breach of the Royalty Agreement includes a theory under Claim 3 premised on IBAT's alleged breach of its obligation to issue quarterly and annual Royalty Notices and reports to NAL.  While IBAT focuses on the fact that it did not breach its duty to pay royalties under the Royalty Agreement, IBAT does not dispute that it has failed to issue the Royalty Notices and reports to NAL.  As a result, while its failure to adduce evidence to support an award of actual damages merits summary judgment as to actual damages, NAL may be able to obtain nominal damages.  Therefore, NAL's failure to establish actual damages is not entirely fatal to this theory under Claim 3.

*Refusal to Permit NAL to Appoint Individuals to IBAT's Advisory Board.*  In Claim 3, NAL alleges that it was deprived of the right to appoint individuals to IBAT's Advisory Board in violation of Section 3.3 of the SEA and claims that it suffered tax consequences as a result of IBAT's breach.  [Doc. 1 at ¶ 198(e)].  There is no dispute that IBAT has not allowed NAL to appoint individuals to IBAT's Advisory Board, and IBAT does not argue that this was not a breach of the SEA—instead, IBAT argues that NAL's claim fails for lack of quantifiable damages.  Again, NAL's inability to quantify its damages from this breach does not absolve IBAT of its potential liability for breach of contract.  [Doc. 98 at 25].  With respect to NAL's "tax consequences," however, Plaintiffs do not point to any supporting evidence for these damages or, indeed, any injury.

Accordingly, summary judgment for IBAT and against NAL is appropriate only as to actual damages for breaches of the Royalty Agreement and Section 3.3 of the SEA.[22]

## IV.    Plaintiffs' Motion for Summary Judgment

As noted above, each side moves for summary judgment, and therefore this Court treats the Parties' cross-motions as "individual motions for summary judgment . . . to the same standard, with each motion viewed in the light most favorable to its nonmoving party." *Banner Bank*, 916 F.3d at 1326.  Here, Plaintiffs seek summary judgment as to some of Plaintiffs' affirmative claims against IBAT, and as to IBAT's two counterclaims against Ms. Borgese and Mr. Privitera.  [Doc. 96].

### A.    Plaintiffs' Affirmative Claims Against IBAT

Plaintiffs first move for summary judgment on some of NAL's claims under the SEA.  Specifically, Plaintiffs seek summary judgment on NAL's claims against IBAT for its failure to (1) pay reimbursable expenses due to NAL under Section 2.3(d);[23] (2) provide NAL with its Board appointment rights under Section 3.2; and (3) issue notices and reports due under the terms of the Royalty Agreement.  [Doc. 96 at 13–15].  To prevail, Plaintiffs

---

[22] The Individual Plaintiffs appear to assert a similar cause of action under Claim 4(e). *See* [Doc. 1 at ¶ 203(e) (asserting IBAT breached the SEA by denying "Borgese and Privitera the right 'to oversee the development and implementation of lithium extraction and processing technology' via appointment to advisory board roles")].  However, Section 3.3 vests any such Advisory Board appointment rights in NAL, not the Individual Plaintiffs, [Doc. 114-1 at 18 § 3.3], and the Individual Plaintiffs do not identify any other basis for their alleged rights to be appointed to the Advisory Board.

[23] Plaintiffs' Motion for Summary Judgment asserts that Ms. Borgese and Mr. Privitera are also entitled to summary judgment as to "their claims for breach of Section 2.3(d) of the SEA."  [Doc. 96 at 13 (capitalization altered)].  However, neither of the Individual Plaintiffs has asserted a claim for breach of Section 2.3(d) of the SEA.  *Compare* [Doc. 1 at ¶ 198(a) (NAL's claim for breach of Section 2.3(d) of the SEA)], *with* [*id.* at ¶¶ 200–204 (Ms. Borgese's and Mr. Privitera's claims under the SEA)].

must establish that no genuine dispute of fact exists for trial and that they are entitled to judgment as a matter of law.

### 1.    Reimbursable Expenses

First, Plaintiffs seek summary judgment on NAL's claims for breach of Section 2.3(d) of the SEA because IBAT has failed to reimburse NAL for certain expenses NAL claims are reimbursable.  Plaintiffs assert that the plain language of Section 2.3 requires IBAT to reimburse NAL for costs accrued since the signing of the BeiSur Agreement, including "legal fees accrued by [NAL] in conjunction with the BeiSur Agreement and this Agreement."  [Doc. 96 at 14].  According to Plaintiffs, IBAT has refused to reimburse NAL for certain amounts owed under Section 2.3 without justification.  These include legal fees paid by NAL to Buchalter and Plaintiffs' payments to Strand Boyce, Garson Soe, and Astrov.  *See* [*id.*].

In Response, IBAT argues that whether the specific expenses at issue in this litigation are reimbursable is a disputed issue of fact.  [Doc. 106 at 19–20].  With respect to the Buchalter legal fees, IBAT points to evidence supporting its belief that NAL already received reimbursement for Buchalter's legal fees through the payment of more than $700,000 via closing of the SEA.  [*Id.* (citing [Doc. 106-7 at 76:5–19; Doc. 106-8 at 2])].  With respect to Plaintiffs' payments to Strand Boyce, Garson Soe, and Astrov, IBAT asserts that NAL has not presented evidence that these expenses were paid by <u>NAL</u>, which is a prerequisite to reimbursement under Section 2.3(d).  [*Id.* at 20]; *see also* [UMF at ¶ 14 (reimbursement is available only for "direct costs paid by NA Lithium for services")].  Because Plaintiffs request reimbursement for expenses incurred not by NAL but its CEO, Ms. Borgese, which are "clearly not reimbursable," and because there is "no

evidence that NAL paid the[se] direct costs," IBAT asserts that NAL's entitlement to reimbursement is a disputed fact. [Doc. 106 at 20 (citing [Doc. 96-11 at 1 (discussing $8,900 paid by Mr. Burba which was not reimbursed by NAL)])].

These disputed fact issues preclude summary judgment for NAL on this claim. *See, e.g.*, *ACP, Inc. v. Skypatrol, LLC*, No. 4:13-cv-01572-PJH, 2017 WL 2224831, at *6–7 (N.D. Cal. May 22, 2017) (denying summary judgment because defendants raised factual issues about the invoices at issue, including by noting that the invoices were directed to parties other than the party entitled to seek reimbursement).

### 2. Appointment of Board of Directors

For the reasons discussed in the context of IBAT's Motion for Summary Judgment, *supra*, the Court finds that Section 3.2 is unambiguous; IBAT's interpretation is consistent with, and Plaintiffs' interpretation foreclosed by, the unambiguous language of Section 3.2; and IBAT is entitled to summary judgment on this claim. Accordingly, Plaintiffs' request for summary judgment on this claim is denied.

### 3. Breach of Royalty Agreement

NAL asserts that IBAT breached its obligations to provide Royalty Notices to NAL under Sections 2 and 3 of the Royalty Agreement. [Doc. 96 at 15]. According to NAL, even if no Royalty Payments are presently due, the Royalty Agreement entitles NAL to Royalty Notices from IBAT which expressly say so, and IBAT has breached this obligation. [*Id*.]. IBAT, in turn, does not dispute that it has not delivered Royalty Notices or Annual Royalty Notices to NAL. [Doc. 106 at ¶¶ 29–30. Instead, IBAT asserts that the existence of a Royalty Payment is a prerequisite to IBAT's duty to provide Annual Royalty Notices or Royalty Notices and, because there is no Product Income and thus no

Royalty Payment due under the Royalty Agreement, its duty to provide such Notices has not been triggered.  [*Id.* at 18].

The Royalty Agreement contains no provisions conditioning the Royalty Notice requirements on the existence of Royalty Payments.  *See* [UMF at ¶¶ 41–45].  Even if IBAT has no Product Income, the Royalty Agreement still requires IBAT to provide a statement to Plaintiffs saying so.  *See* [*id.*].  Accordingly, in the absence of a dispute of material fact, NAL is entitled to summary judgment on this claim.  However, as discussed above, NAL's recovery will be limited to nominal damages, at most, in light of its failure to adduce sufficient evidence of actual damages.

### B.    IBAT's Counterclaims Against Ms. Borgese and Mr. Privitera

Next, Plaintiffs assert that IBAT cannot proceed on its counterclaims for usurpation of corporate opportunities and tortious interference against the Individual Plaintiffs because (1) any such claims are barred by equitable estoppel, and (2) IBAT cannot demonstrate damages caused by any alleged usurpation or interference.

### 1.    Usurpation of Corporate Opportunities and Tortious Interference

Colorado law recognizes that a corporate officer has a fiduciary duty not to usurp a corporate opportunity.  *See Collie v. Becknell*, 762 P.2d 727, 730 (Colo. App. 1988).  A corporation claiming breach of this fiduciary duty must also establish that it had an actual or expected interest in the opportunity.  *See id.*  A party claiming breach of this fiduciary duty must prove:  "1) that the defendant was acting as a fiduciary of the plaintiff; 2) that he breached a fiduciary duty to the plaintiff; 3) that the plaintiff incurred damages; and 4) that the defendant's breach of fiduciary duty was a cause of the plaintiff's damages." *Graphic Directions v. Bush*, 862 P.2d 1020, 1022 (Colo. App. 1993).

A breach of fiduciary duty may also support a claim for tortious interference.  *See McCrea & Co. Auctioneers, Inc. v. Dwyer Auto Body*, 799 P.2d 394, 397–98 (Colo. App. 1989); *Occusafe, Inc. v. EG & G Rocky Flats, Inc.,* 54 F.3d 618, 623 (10th Cir. 1995) (interpreting Colorado law).  A plaintiff claiming tortious interference must demonstrate intentional and improper interference preventing the formation of a contract.  *Dolton v. Capitol Fed. Sav. & Loan Ass'n*, 642 P.2d 21, 23 (Colo. App. 1981).

**Fiduciary Duties and the EEAs.**  The Individual Plaintiffs assert that provisions in their EEAs nevertheless empowered them to pursue opportunities to work with SSI.[24] [Doc. 96 at 15–16].  IBAT counters that the EEAs do not allow the Individual Plaintiffs to usurp corporate opportunities, and Plaintiffs' arguments conflate two legally distinct concepts:  the duty not to compete and the duty not to usurp corporate opportunities. [Doc. 106 at 21].

Courts recognize that these are distinct duties.  *See, e.g.*, *Miles Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 667 (6th Cir. 2010); *cf. Fulcrum Fin. Partners v. Meridian Leasing Corp.*, 230 F.3d 1004, 1013 (7th Cir. 2000) (noting on one hand "the common law duty of noncompetition between agents and principals" and "between partners" and "[o]n the other hand," the "partners' fiduciary duty . . . not to usurp opportunities that properly belong to the partnership"); *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 413–14 (E.D.N.Y. 2012) (discussing distinctions between theories of unfair competition and usurpation of corporate opportunities).  A party

---

[24] Plaintiffs did not raise the argument that IBAT failed to present any evidence of an actual or expected interest in the SSI opportunity in its Motion, [Doc. 96], instead raising this argument for the first time in their Reply, [Doc. 115 at 9 ("Without evidence that the SSI opportunity actually belonged to IBAT, IBAT's claims for tortious interference and usurpation of corporate opportunity fail.")].

cannot modify its fiduciary duty without expressly affirming its intent to do so. *See, e.g.*, *McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen Lifestyle Centers-Centerra LLC*, 486 P.3d 439, 446 (Colo. App. 2021).

Here, the Carveout Provisions in the EEAs do not modify the Individual Plaintiffs' fiduciary duties in any way. *See* [Doc. 95-2 at 15; Doc. 95-3 at 15]. And IBAT points to evidence that SSI and IBAT were actively discussing working together, [Doc. 106-1 at 120:9–122:1]; IBAT informed Plaintiffs that SSI constituted a corporate opportunity for IBAT and instructed Plaintiffs to contact SSI only on IBAT's behalf, [Doc. 106-3 at 3]; in spite of these instructions, the Individual Plaintiffs usurped IBAT's opportunity to work with SSI, [Doc. 106-2 at 189:3–12]; and, as a result, IBAT lost the opportunity to work with SSI, [Doc. 106-10 at 104:12–105:6].

*Equitable Estoppel.* Nevertheless, according to Plaintiffs, because the Individual Plaintiffs' EEAs with IBAT "*specifically allowed them* to pursue the SSI Opportunity independently of IBAT," equitable estoppel bars IBAT's counterclaims against the Individual Plaintiffs. [Doc. 96 at 16]. IBAT counters that the Individual Plaintiffs' equitable estoppel defense fails for lack of evidence to support any of the four required elements. [Doc. 106 at 22–23].

For equitable estoppel to apply, (1) "the party to be estopped by its conduct must know the facts," (2) "that party must intend that the conduct be acted upon or must act so the party asserting estoppel is justified in believing the conduct was so intended," (3) "the party asserting estoppel must be ignorant of the true facts," and (4) "that party must detrimentally rely on the other party's conduct." *Bontrager v. La Plata Elec. Ass'n Inc.*, 68 P.3d 555, 561 (Colo. App. 2003).

IBAT argues that there is no evidence that it knew upon their execution that the EEAs included illegal terms; no evidence that IBAT intended the Individual Plaintiffs to rely upon illegal contract terms; no evidence that the Individual Plaintiffs were unaware that their covenants not to compete were unenforceable; and no evidence of the Individual Plaintiffs' detrimental reliance. [Doc. 106 at 22–23]. In Reply, Plaintiffs assert—without supporting citations to the record—that "[t]he undisputed facts demonstrate[] 1) that IBAT developed a belief that the Carveout Provisions were illegal or unenforceable, 2) that IBAT then subsequently *chose not to inform Plaintiffs* of the supposed illegality even though they were relying on those provisions, and then 3) purported to terminate Borgese and Privitera for that reliance." [Doc. 115 at 9]. Plaintiffs' arguments overstate the "undisputed facts" on these issues. Indeed, material fact disputes abound.

For example, the Parties dispute the details of conversations between IBAT and Ms. Borgese and Mr. Privitera. Plaintiffs point to Ms. Borgese's testimony that IBAT "demanded" that she and Mr. Privitera "abandon" their EEAs, [Doc. 96 at ¶ 38 (citing [Doc. 96-1 at 161:17–22])], and cite to the testimony of IBAT's chief legal officer, John Ashburn, to support their argument that Mr. Ashburn never specified which provisions in the EEAs he considered "illegal" and never provided any follow up communication to Mr. Privitera or Ms. Borgese regarding the alleged issue, [*id.* (citing [Doc. 97 at 33:2–6, 33:13–14, 33:21–25, 34:21–25, 35:3–10, 37:15–38:11, 42:19–21, 43:2–5, 43:9–12])].

However, IBAT points out that Mr. Ashburn testified in his deposition that he told Ms. Borgese and Mr. Privitera that: (a) "[t]here were provisions in the agreement that [he] felt created irreconcilable conflicts of interest between the employees and the company," (b) "these were very serious matters that needed to be addressed," and (c) "if they were not addressed at some point, the company would need to take some form of

action with respect to them."  [Doc. 106 at ¶ 38 (quoting [Doc. 106-7 at 33:2–36:11, 44:20–25])].  Defendant also notes that Mr. Ashburn testified that Ms. Borgese and Mr. Privitera refused to engage in any further discussions on the issue until they were paid amounts they claimed NAL was owed.  [*Id.* (citing [Doc. 106-7 at 33:2–36:11, 44:20–25])].

Moreover, evidence in the record shows that, at least as early as May 7, 2018, Mr. Ashburn informed Ms. Borgese that "Directors and Senior Officers of a Company cannot compete with the Company that employs them," and if Ms. Borgese or Mr. Privitera "were thinking of pursuing a Lithium related transaction with SSI outside of IBAT," they "would need to present that to the IBAT Board for consideration" because he "consider[ed] any potential transaction with SSI related to Lithium to be a corporate opportunity of IBAT."  [Doc. 96-14 at 3]; *see also* [Doc. 106-7 at 60:20–62:15; Doc. 106 at ¶ 50].  Evidence that Ms. Borgese and Mr. Privitera were told that IBAT's Board needed to approve any "independent operations with SSI" outside of IBAT, [Doc. 106 at ¶ 43 (citing [Doc. 96-14 at 2])], is contrary to a showing that Ms. Borgese and Mr. Privitera were "ignorant of the true facts" as required to warrant equitable estoppel.  The Individual Plaintiffs are not entitled to summary judgment on this issue.

### 2.    Damages

Under Colorado law, a party can survive summary judgment by demonstrating facts from which its damages can be proven with a reasonable degree of certainty.  *See Tull v. Gundersons, Inc.*, 709 P.2d 940, 944–45 (Colo. 1985) ("In proving the amount of damages it is sufficient for a plaintiff to provide a reasonable basis for computation and the best evidence obtainable under the circumstances of the case which will enable the trier of the facts to arrive at a fairly approximate estimate of the loss." (cleaned up)).

55

Here, IBAT estimated its damages at between $200,000 and $300,000, based upon the value IBAT attributes to the SSI opportunity.  *See* [Doc. 106-16 at 3; Doc. 106-19 at 3; Doc. 106 at ¶ 61].  IBAT's estimate is based on Mr. Burba's decades of experience, which constitutes a reasonable basis for discerning such damages for purposes of summary judgment.  IBAT also identifies the agreement reached between SSI and the Individual Plaintiffs in 2019 as sufficiently definite to calculate the value of the SSI opportunity.  [Doc. 106-16 at 3; Doc. 106 at ¶ 53].

Because IBAT has come forward with evidence of its damages attributable to the SSI opportunity, Plaintiffs have not established that they are entitled to summary judgment based on lack of damages.  Based on the record before it, this Court concludes that disputed issues of fact preclude summary judgment on IBAT's Counterclaims.

## PLAINTIFFS' MOTION TO BIFURCATE

Finally, the Court turns to Plaintiffs' request to bifurcate the Individual Plaintiffs' "potential claims" for damages from the "deprivation of sale opportunities of stock" caused by IBAT's delay in issuing certain unrestricted shares to the Individual Plaintiffs in a tradeable format.  [Doc. 86 at 2].  Plaintiffs assert that these damages (if any) are not yet calculable, and they seek bifurcation "to avoid any application of res judicata as to this claim once it becomes calculable in the future."  [*Id.*].  Plaintiffs also ask that this Court bifurcate NAL's claims for attorney's fees under Section 6, and "costs associated with IBAT's failure to carry out the transactions contemplated by the [SEA]."  [*Id.*].

## I.   Legal Standard

Rule 42 of the Federal Rules of Civil Procedure permits a court to order separate trials in a case "[f]or convenience, to avoid prejudice, or to expedite and economize."  Fed.

R. Civ. P. 42(b).  Courts have "broad discretion" in deciding to bifurcate trials, *Green Constr. Co. v. Kan. Power & Light Co.*, 1 F.3d 1005, 1011 (10th Cir. 1993) (quotation omitted), and three considerations guide the Court's bifurcation analysis:  (1) whether bifurcation would be in the interest of convenience and judicial economy; (2) whether the issues are separable; and (3) whether bifurcation would be unfair to any party, *Bonham v. GEICO Cas. Co.*, No. 15-cv-02109-MEH, 2016 WL 26513, at *1 (D. Colo. Jan. 4, 2016). "[D]espite the trial court's broad discretion to bifurcate issues for trial, 'separate trials of claims properly joined is not the usual course.'"  *Pinon Sun Condo. Ass'n, Inc. v. Atain Specialty Ins. Co.*, No. 17-cv-01595-CMA-NRN, 2018 WL 5312881, at *4 (D. Colo. Oct. 26, 2018) (quoting *TBG, Inc. v. Bendis*, 160 F.R.D. 621, 622 (D. Kan. 1995)); *see also* Fed. R. Civ. P. 42(b) advisory committee's note to 1966 amendment (bifurcation should not be "routinely ordered," but it should nevertheless be "encouraged where experience has demonstrated its worth").  "It is well established that the movant bears the burden regarding a motion to bifurcate."  *Anderson v. Am. Nat'l Prop. & Cas. Co.*, No. 17-cv-03016-REB-KMT, 2018 WL 10609649, at *2 (D. Colo. Feb. 9, 2018).

At all times, the Court is guided by the principles of Rule 1, which states that the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.

## II.    Analysis

After reviewing the Parties' briefing and the applicable case law, the Court cannot conclude that bifurcation is appropriate here.   The Court first addresses Plaintiffs' arguments relating to the bifurcation of NAL's claim for attorney's fees under Section 6 of

the SEA before turning the bulk of its analysis to whether bifurcation of the "lost sale opportunity" claims is warranted.

## A.    Damages Associated with Section 6 of the SEA

Plaintiffs seek to bifurcate the issue of damages related to NAL's "attorney's fees incurred as a result of their efforts to trade their shares and in the prosecution of this lawsuit," which Plaintiffs assert were incurred "as a result of attempting to 'carry out' the transactions contemplated by [Section 6 of] the SEA."   [Doc. 86 at 11].   Plaintiffs' argument relies on the assumption that attorney's fees incurred <u>in the litigation of this case</u> are recoverable under the SEA.  However, as this Court concluded in the context of IBAT's Motion for Summary Judgment, *see supra*, NAL's claim under Section 6 of the SEA fails as a matter of law.  Thus, there are no remaining issues relating to Section 6 still subject to potential bifurcation.

## B.    Lost Sale Opportunity Claims

Turning to the "potential" damages at the center of the Parties' arguments, the Court first considers convenience and judicial economy.  *Bonham*, 2016 WL 26513, at *1. "[A] single trial generally is more convenient, subject to fewer delays, and is less costly than multiple trials."  *Leone v. Owsley*, No. 12-cv-02961-PAB-KMT, 2016 WL 9735826, at *2 (D. Colo. June 23, 2016) (alteration in original) (quotation omitted).  Indeed, bifurcating the trial in this case would require this Court to hold two separate pre-trial conferences, block off trial time on its calendar in two separate weeks, and potentially entertain two separate rounds of motions in limine; it would also require court staff to prepare for two separate trials.

Next, the Court considers whether bifurcation would be unfair to any party, *Bonham*, 2016 WL 26513, at *1, or avoid prejudice to any party, Fed. R. Civ. P. 42(b).[25] IBAT argues that Plaintiffs "cannot use a motion to bifurcate as a substitute for their failure to seek to promptly amend their complaint" because, "[a]mong other things, Plaintiffs' attempted circumvention of their pleading obligation would deprive IBAT of the opportunity to challenge whether their claim states a claim upon which relief can be granted." [Doc. 90 at 10 & n.4]. IBAT points out that "Plaintiffs' Complaint identifies neither a cause of action based on the delay in the issuance of the Shares, a breach of any obligation for the new alleged bad acts, causation of any damages[,] nor [P]laintiffs' basis for recovery." [*Id.* at 10]. The Court respectfully agrees with IBAT insofar as IBAT asserts that it would be unfair to permit Plaintiffs' use of Rule 42 as a workaround for their failure to seek amendment under Rule 15.

Indeed, Plaintiffs' Motion to Bifurcate asks the Court for, among other things, (1) leave for Plaintiffs to file a "supplemental pleading describing the events that have transpired . . . since October of 2021," and (2) "a separate trial on claims for breach of the SEA arising from the lost sale opportunities . . . with a schedule for discovery as to these claims." [Doc. 86 at 10 (emphasis added)]. At no point did Plaintiffs seek leave to amend their Complaint, and Plaintiffs waited until *after the close of discovery* to request "a schedule of discovery" as to lost sale opportunity claims they have not asserted in this action. Plaintiffs cannot use bifurcation under Rule 42(b) as a means of advancing unpled

---

[25] The Parties have not briefed the issue of separability, so the Court does not consider this issue in deciding whether to grant Plaintiffs' Motion to Bifurcate.

claims or reopening discovery.   Instead, Plaintiffs must seek leave to amend their
Complaint pursuant to Rule 15.

With respect to the prejudicial effect of bifurcation, the Court also finds IBAT's
citation to *Wolf Creek Ski Corp. v. Leavell-McCombs Joint Venture*, No. 04-cv-01099-
JLK-DLW, 2008 WL 496303 (D. Colo. Feb. 20, 2008), persuasive.   In that case, a
counterclaimant moved to bifurcate after discovery closed, "seeking . . . a separate trial
on its counterclaim damages" and "a lengthy stay of any trial on this issue to allow the
[counterclaimant] to" ascertain the "costs which it claims as damages."   *Id.* at *1.   In
denying the motion to bifurcate, the court found that delaying a claim for resolution "very
likely years in the future" would "severely prejudice" the counterclaim defendant, allow the
counterclaimant to "reformulate its damages theory and evidence," and force the
counterclaim defendant to expend additional time and resources on a new round of
litigation and discovery "at some undetermined point in the future."   *Id.* at *2.

Here, Plaintiffs waited until after the close of written discovery to move for
bifurcation, *see* [Doc. 79; Doc. 85], and now use the Motion to Bifurcate as a means of
securing leave to amend their Complaint, reopen discovery, and stay litigation of the
bifurcated issues for no less than six months—all premised on an unpled legal theory.
Furthermore, any prejudice to Plaintiffs is, at this juncture, speculative at best.   *See, e.g.*,
[Doc. 86 at 10 (asking for a six-month stay of the "bifurcated proceeding" to provide
Plaintiffs time to "assess <u>whether</u> the conditions with the IBAT shares are such that
Plaintiffs may present a damages analysis" (emphasis added))].   Plaintiffs' prejudice
arguments relate to possible claims for possible damages.   But "the mere possibility of
some prejudice does not justify separate trials where such prejudice is not substantial

and there are strong countervailing considerations of economy." *Tri-R Sys., Ltd. v. Friedman & Son, Inc.*, 94 F.R.D. 726, 728 (D. Colo. 1982).

"Bifurcating trial now to allow [Plaintiffs] to reformulate [their] damages theory and evidence based on [lost sale opportunity claims] that," in Plaintiffs' view, "have not yet [accrued]," would "prejudice [IBAT] by requiring it to expend time and resources on an entirely new round of fact and expert discovery at some undetermined point in the future. *Wolf Creek Ski Corp.*, 2008 WL 496303, at *2.  For these same reasons, bifurcation at this time would neither be economical nor expedite resolution of this action as contemplated by Rule 42(b)."  *Id.*  Under the circumstances, bifurcation as proposed by Plaintiffs would not be convenient or economical, certainly would not expedite proceedings, and would severely prejudice IBAT.  Moreover, because Plaintiffs have not filed a motion to amend the Complaint to assert these "potential" lost sale opportunity claims, any question of bifurcation or separate trials cannot be determined at this time.

For all of these reasons, and in its discretion, the Court does not find that bifurcation is warranted under Rule 42(b).  Accordingly, Plaintiffs' Motion to Bifurcate is **DENIED**.

<h3 style="text-align:center">CONCLUSION</h3>

For the reasons set forth herein, it is **ORDERED** that:

(1)    Defendant's Motion for Partial Summary Judgment [Doc. 98] is **GRANTED IN PART** and **DENIED IN PART**;[26]

---

[26] As set forth herein, summary judgment is granted for IBAT and against Ms. Borgese and Mr. Privitera on Claims 1(a) through (e) and (g) and Claims 2(a) through (e) and (g), respectively.  *See supra* § III.B.1.  Summary judgment is granted for IBAT and against NAL on Claim 3 only as to breach of Section 3.2 of the SEA (*supra* § III.B.2.c); attorney's fees under Section 6 of the SEA (*supra* § III.B.2.d); and actual damages for breach of the

(2)     Plaintiffs' Motion for Partial Summary Judgment [Doc. 96] is **GRANTED IN PART** and **DENIED IN PART**;[27]

(3)     Plaintiffs' Verified Motion for Bifurcation of Trial Pursuant to Fed. R. Civ. P. 42(b) [Doc. 86] is **DENIED**;

(4)     Plaintiffs' Motion for Leave to File a Sur-Reply Brief in Opposition to Internation [sic] Battery Ltd.'s Motion for Partial Summary Judgment [Doc. 117] is **DENIED**;

(5)     A Telephonic Status Conference is **SET** for **November 14, 2024 at 1:00 PM**, for the purposes of setting a Final Pretrial/Trial Preparation Conference and a jury trial in this matter.  The Parties shall participate by dialing **888-363-4749, Access Code:  5738976#**; and

(6)     Due to some ambiguity in the Parties' papers, the Parties shall **FILE** a Joint Notice to the Court, identifying the precise claims, counterclaims and theories that remain in this action to be tried, as cabined by the Complaint [Doc. 1] and the Counterclaims [Doc. 28], and the number of days anticipated for trial, no later than **November 7, 2024**.[28]

---

Royalty Agreement and Section 3.3 of the SEA (*supra* § III.B.3).   Finally, summary judgment is granted for IBAT and against the Individual Plaintiffs as to Claims 4(b) through (d) and (f).   *See supra* § III.B.2.a–d.   The foregoing claims, as set forth in Plaintiffs' Complaint, [Doc. 1], are dismissed with prejudice.   In all other respects, summary judgment for IBAT is denied.

[27] Summary judgment is granted for NAL and against IBAT as to Claim 3 with respect to IBAT's liability for breach of the Royalty Agreement.   *See supra* § IV.A.3.   In all other respects, Plaintiffs' requests for summary judgment are denied.

[28] For guidance purposes only, the Court summarizes its understanding of the Parties' remaining claims as follows.  The remaining claims under the Individual Plaintiffs' EEAs include only Claims 1(f) and 2(f) for breach of Section 2(b) of the EEAs.  With respect to claims brought by NAL under the SEA, the following remain for trial:  Claim 3(a) (except with respect to attorney's fees under Section 6 of the SEA), Claim 3(b) for "payment to

DATED:  September 30, 2024                    BY THE COURT:

                                              Nina Y. Wang
                                              United States District Judge

---

non-designee," Claims 3(e) and (f) for breach of Section 3.3 of the SEA (only with respect to nominal damages and liability), and Claim 3(h) for licensing of technology to other parties in violation of the SEA.  With respect to the Individual Plaintiffs' claims under the SEA, only Claim 4(a) remains.  Finally, IBAT's counterclaims against the Individual Plaintiffs also remain.